BANTAM BOOKS, INC., ᴇᴛ ᴀʟ. *v.* SULLIVAN ᴇᴛ ᴀʟ.

No. 118.   Argued December 3–4, 1962.—Decided February 18, 1963.

*Horace S. Manges* argued the cause for appellants. With him on the briefs were *Jacob F. Raskin* and *Milton Stanzler.*

*J. Joseph Nugent,* Attorney General of Rhode Island, argued the cause for appellees. With him on the brief was *Joseph L. Breen.*

*Irwin Karp* filed a brief for the Authors League of America, Inc., as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Rhode Island Legislature created the "Rhode Island Commission to Encourage Morality in Youth," whose members and Executive Secretary are the appellees herein, and gave the Commission *inter alia* ". . . the duty . . . to educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, or manifestly tending to the corruption of the youth as de-

fined in sections 13, 47, 48 and 49 of chapter 610 of the general laws, as amended, and to investigate and recommend the prosecution of all violations of said sections . . . ."[1]  The appellants brought this action in

---

[1] Resolution No. 73 H 1000, R. I. Acts and Resolves, January Session 1956, 1102–1103. The resolution created a "commission to encourage morality in youth," to be composed of nine members appointed by the Governor of the State. The members were to serve for staggered, five-year terms. They were to receive no compensation, but their expenses, as well as the expenses incurred in the operation of the Commission generally, were to be defrayed out of annual appropriations. The original mandate of the Commission was superseded in part by Resolution No. 95 S 444, R. I. Acts and Resolves, January Session 1959, 880, which reads as follows:

"It shall be the duty of said commission to educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, as defined in chapter 11–31 of the general laws, entitled 'Obscene and objectionable publications and shows,' and to investigate and recommend the prosecution of all violations of said sections, and it shall be the further duty of said commission to combat juvenile delinquency and encourage morality in youth by (a) investigating situations which may cause, be responsible for or give rise to undesirable behavior of juveniles, (b) educate the public as to these causes and (c) recommend legislation, prosecution and/or treatment which would ameliorate or eliminate said causes."

The Commission's activities are not limited to the circulation of lists of objectionable publications. For example, the annual report of the Commission issued in January 1960, recites in part:

"In September, 1959, because of the many complaints from outraged parents at the type of films being shown at the Rhode Island Drive-Ins and also the lack of teen-age supervision while parked, this Commission initiated and completed a survey on the Drive-In Theatres in the State. High points of the survey note that there are II (2) Drive-in theatres in Rhode Island which operate through summer months and remain open until November and then for weekends during the winter, providing car-heaters.

.        .        .        .        .

"Acting on its power to investigate causes of delinquency, the Commission has met with several state officials for a discussion of juvenile

the Superior Court of Rhode Island (1) to declare the law creating the Commission in violation of the First and Fourteenth Amendments, and (2) to declare unconstitutional and enjoin the acts and practices of the appellees thereunder.   The Superior Court declined to declare the law creating the Commission unconstitutional on its face but granted the appellants an injunction against the acts and practices of the appellees in performance of their duties.   The Supreme Court of Rhode Island affirmed the Superior Court with respect to appellants' first prayer but reversed the grant of injunctive relief.   —— R. I. ——, 176 A. 2d 393 (1961).[2]   Appellants brought this appeal and we noted probable jurisdiction, 370 U. S. 933.[3]

Appellants are four New York publishers of paperback books which have for sometime been widely distributed in Rhode Island.   Max Silverstein & Sons is the exclusive wholesale distributor of appellants' publications throughout most of the State.   The Commission's practice has been to notify a distributor on official Commission stationery that certain designated books or magazines distributed by him had been reviewed by the Commission and had been declared by a majority of its members to be objectionable for sale, distribution or display to youths under 18 years of age.   Silverstein had received at least 35 such notices at the time this suit was brought.   Among

drinking, the myriad and complex causes of delinquency, and legal aspects of the Commission's operations.   It also held a special meeting with Rhode Island police and legal officials in September, 1959, for a discussion on the extent of delinquency in Rhode Island and the possible formation of state-wide organization to combat it."

[2] The action was brought pursuant to Title 9, c. 30, Gen. Laws R. I., 1956 ed., as amended (Uniform Declaratory Judgments Act).

[3] Our appellate jurisdiction is properly invoked, since the state court judgment sought to be reviewed upheld a state statute against the contention that, on its face and as applied, the statute violated the Federal Constitution.   28 U. S. C. § 1257 (2).   *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282.

the paperback books listed by the Commission as "objectionable" were one published by appellant Dell Publishing Co., Inc., and another published by appellant Bantam Books, Inc.[4]

The typical notice to Silverstein either solicited or thanked Silverstein, in advance, for his "cooperation" with the Commission, usually reminding Silverstein of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity.[5]   Copies of the

---

[4] Peyton Place, by Grace Metalious, published (in paperback edition) by appellant Dell Publishing Co., Inc.; The Bramble Bush, by Charles Mergendahl, published (in paperback edition) by appellant Bantam Books, Inc.   Most of the other 106 publications which, as of January 1960, had been listed as objectionable by the Commission were issues of such magazines as "Playboy," "Rogue," "Frolic," and so forth.   The Attorney General of Rhode Island described some of the 106 publications as "horror" comics which he said were not obscene as this Court has defined the term.

[5] The first notice received by Silverstein reads, in part, as follows:

"This agency was established by legislative order in 1956 with the immediate charge to prevent the sale, distribution or display of indecent and obscene publications to youths under eighteen years of age.

"The Commissions [sic] have reviewed the following publications and by majority vote have declared they are completely objectionable for sale, distribution or display for youths and [sic] eighteen years of age.

.        .        .        .        .

"The Chiefs of Police have been given the names of the aforementioned magazines with the order that they are not to be sold, distributed or displayed to youths under eighteen years of age.

"The Attorney General will act for us in case of non-compliance.

"The Commissioners trust that you will cooperate with this agency in their work. . . .

"Another list will follow shortly.

"Thanking you for your anticipated cooperation, I am,

"Sincerely yours
"Albert J. McAloon
"Executive Secretary"

lists of "objectionable" publications were circulated to local police departments, and Silverstein was so informed in the notices.

Silverstein's reaction on receipt of a notice was to take steps to stop further circulation of copies of the listed publications. He would not fill pending orders for such publications and would refuse new orders. He instructed his field men to visit his retailers and to pick up all unsold copies, and would then promptly return them to the publishers. A local police officer usually visited Silverstein shortly after Silverstein's receipt of a notice to learn what action he had taken. Silverstein was usually able to inform the officer that a specified number of the total of copies received from a publisher had been returned. According to the testimony, Silverstein acted as he did on receipt of the notice "rather than face the possibility of some sort of a court action against ourselves, as well as the people that we supply." His "cooperation" was given to avoid becoming involved in a "court proceeding" with a "duly authorized organization."

The Superior Court made fact findings and the following two, supported by the evidence and not rejected by the Supreme Court of Rhode Island, are particularly relevant:

> "8. The effect of the said notices [those received by Silverstein, including the two listing publications

---

Another notice received by Silverstein reads in part:

"This list should be used as a guide in judging other similar publications not named.

"Your cooperation in removing the listed and other objectionable publications from your newstands [sic] will be appreciated. Cooperative action will eliminate the necessity of our recommending prosecution to the Attorney General's department."

An undated "News Letter" sent to Silverstein by the Commission reads in part: "The lists [of objectionable publications] have been sent to distributors and police departments. To the present cooperation has been gratifying."

of appellants] were [*sic*] clearly to intimidate the various book and magazine wholesale distributors and retailers and to cause them, by reason of such intimidation and threat of prosecution, (a) to refuse to take new orders for the proscribed publications, (b) to cease selling any of the copies on hand, (c) to withdraw from retailers all unsold copies, and (d) to return all unsold copies to the publishers.

"9. The activities of the Respondents [appellees here] have resulted in the suppression of the sale and circulation of the books listed in said notices . . . ."

In addition to these findings it should be noted that the Attorney General of Rhode Island conceded on oral argument in this Court that the books listed in the notices included several that were not obscene within this Court's definition of the term.

Appellants argue that the Commission's activities under Resolution 73, as amended, amount to a scheme of governmental censorship devoid of the constitutionally required safeguards for state regulation of obscenity, and thus abridge First Amendment liberties, protected by the Fourteenth Amendment from infringement by the States. We agree that the activities of the Commission are unconstitutional and therefore reverse the Rhode Island court's judgment and remand the case for further proceedings not inconsistent with this opinion.[6]

---

[6] Appellants' standing has not been, nor could it be, successfully questioned. . The appellants have in fact suffered a palpable injury as a result of the acts alleged to violate federal law, and at the same time their injury has been a legal injury. See *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 151–152 (concurring opinion). The finding that the Commission's notices impaired sales of the listed publications, which include two books published by appellants, establishes that appellants suffered injury. It was a legal injury, although more needs be said to demonstrate this. The Commisson's notices were circulated only to distributors and not, so far

We held in *Alberts* v. *California,* decided with *Roth* v. *United States,* 354 U. S. 476, 485, that "obscenity is not within the area of constitutionally protected speech or press" and may therefore be regulated by the States. But this principle cannot be stated without an important qualification:

"... [I]n *Roth* itself we expressly recognized the complexity of the test of obscenity fashioned in that case, and the vital necessity in its application of safe-guards to prevent denial of 'the protection of freedom of speech and press for material which does not treat

as appears, to publishers. The Commission purports only to regulate distribution; it has made no claim to having jurisdiction of out-of-state publishers. However, if this were a private action, it would present a claim, plainly justiciable, of unlawful interference in advantageous business relations. *American Mercury, Inc.,* v. *Chase,* 13 F. 2d 224 (D. C. D. Mass. 1926). Cf. 1 Harper and James, Torts (1956), §§ 6.11–6.12. See also *Pocket Books, Inc.,* v. *Walsh,* 204 F. Supp. 297 (D. C. D. Conn. 1962). It makes no difference, so far as appellants' standing is concerned, that the allegedly unlawful interference here is the product of state action. See *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Truax* v. *Raich,* 239 U. S. 33; *Terrace* v. *Thompson,* 263 U. S. 197, 214–216; *Columbia Broadcasting System* v. *United States,* 316 U. S. 407, 422–423. Furthermore, appellants are not in the position of mere proxies arguing another's constitutional rights. The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication, *Lovell* v. *Griffin,* 303 U. S. 444, 452, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants. Finally, pragmatic considerations argue strongly for the standing of publishers in cases such as the present one. The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights. The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied. Cf. *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 459.

sex in a manner appealing to prurient interest.' [354 U. S., at 488] . . . . It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." *Marcus* v. *Search Warrant,* 367 U. S. 717, 730–731.

Thus, the Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments. Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards, *Smith* v. *California,* 361 U. S. 147; *Marcus* v. *Search Warrant, supra,* is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks. See, *e. g., Thornhill* v. *Alabama,* 310 U. S. 88; *Winters* v. *New York,* 333 U. S. 507; *NAACP* v. *Button,* 371 U. S. 415. "[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated . . . is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools . . . ." *Speiser* v. *Randall,* 357 U. S. 513, 525.

But, it is contended, these salutary principles have no application to the activities of the Rhode Island Commission because it does not regulate or suppress obscenity but simply exhorts booksellers and advises them of their legal rights. This contention, premised on the Commission's want of power to apply formal legal sanctions, is untenable. It is true that appellants' books have not

been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim.[7]  We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.[8]

---

[7] For discussions of the problem of "informal censorship," see Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 6–9 and n. 7–22 (1960); Note, Extralegal Censorship of Literature, 33 N. Y. U. L. Rev. 989 (1958); Note, Entertainment: Public Pressures and the Law, 71 Harv. L. Rev. 326, 344–347 (1957); Note, Regulation of Comic Books, 68 Harv. L. Rev. 489, 494–499 (1955); Comment, Censorship of Obscene Literature by Informal Governmental Action, 22 Univ. of Chi. L. Rev. 216 (1954); Lockhart and McClure, Literature, the Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 309–316 (1954).

[8] Threats of prosecution or of license revocation, or listings or notifications of supposedly obscene or objectionable publications or motion pictures, on the part of chiefs of police or prosecutors, have been enjoined in a number of cases. See *Kingsley International Pictures Corp.* v. *Blanc,* 396 Pa. 448, 153 A. 2d 243 (1959); *Bunis* v. *Conway,* 17 App. Div. 2d 207, 234 N. Y. S. 2d 435 (1962) (*dictum*); *Sunshine Book Co.* v. *McCaffrey,* 4 App. Div. 2d 643, 168 N. Y. S. 2d 268 (1957); *Random House, Inc.,* v. *Detroit,* No. 555684 Chancery, Cir. Ct., Wayne County, Mich., March 29, 1957; *HMH Publishing Co.* v. *Garrett,* 151 F. Supp. 903 (D. C. N. D. Ind. 1957); *New American Library of World Literature* v. *Allen,* 114 F. Supp. 823 (D. C. N. D. Ohio 1953); *Bantam Books, Inc.,* v. *Melko,* 25 N. J. Super. 292, 96 A. 2d 47 (Chancery 1953), modified on other grounds, 14 N. J. 524, 103 A. 2d 256 (1954); *Dearborn Publishing Co.* v. *Fitzgerald,* 271 F. 479 (D. C. N. D. Ohio 1921);

It is not as if this were not regulation by the State of Rhode Island. The acts and practices of the members and Executive Secretary of the Commission disclosed on this record were performed under color of state law and so constituted acts of the State within the meaning of the Fourteenth Amendment. *Ex parte Young,* 209 U. S. 123. Cf. *Terry* v. *Adams,* 345 U. S. 461. These acts and practices directly and designedly stopped the circulation of publications in many parts of Rhode Island. It is true, as noted by the Supreme Court of Rhode Island, that Silverstein was "free" to ignore the Commission's notices, in the sense that his refusal to "cooperate" would have violated no law. But it was found as a fact—and the finding, being amply supported by the record, binds us— that Silverstein's compliance with the Commission's directives was not voluntary. People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and Silverstein's reaction, according to uncontroverted testimony, was no exception to this general rule. The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore.* It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when

*Epoch Producing Corp.* v. *Davis,* 19 Ohio N. P. (N. S.) 465 (C. P. 1917). Cf. *In re Louisiana News Co.,* 187 F. Supp. 241 (D. C. E. D. La. 1960); *Roper* v. *Winner,* 244 S. W. 2d 355, 357 (Tex. Civ. App. 1951); *American Mercury, Inc.,* v. *Chase,* 13 F. 2d 224 (D. C. D. Mass. 1926). Relief has been denied in the following cases: *Pocket Books, Inc.,* v. *Walsh,* 204 F. Supp. 297 (D. C. D. Conn. 1962); *Dell Publishing Co.* v. *Beggans,* 110 N. J. Eq. 72, 158 A. 765 (Chancery 1932). See also *Magtab Publishing Corp.* v. *Howard,* 169 F. Supp. 65 (D. C. W. D. La. 1959). None of the foregoing cases presents the precise factual situation at bar, and we intimate no view one way or the other as to their correctness.

they plainly serve as instruments of regulation independent of the laws against obscenity.[9]  Cf. *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123.

Herein lies the vice of the system.  The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary.  In thus obviating the need to employ criminal sanctions, the State

---

[9] We note that the Commission itself appears to have understood its function as the proscribing of objectionable publications, and not merely the giving of legal advice to distributors.  See the first notice received by Silverstein, quoted in note 5, *supra.*  The minutes of one of the Commission's meetings read in part:

". . . Father Flannery [a member of the Commission] noted that he had been called about magazines proscribed by the Commission remaining on sale after lists had been *scent* [*sic*] to distributors and police, to which Mr. McAloon suggested that it could be that the same magazines were seen, but that it probably was not the same edition proscribed by the Commission.

"Father Flannery questioned the state-wide compliance by the police, or anyone else, to get the proscribed magazines off the stands. Mr. McAloon showed the Commissioners the questionnaires sent to the chiefs of police from this office and returned to us."

The minutes of another meeting read in part:

". . . Mr. Sullivan [member of the Commission] suggested calling the Cranston Chief of Police to inquire the reason Peyton Place was still being sold, distributed and displayed since the Police departments had been advised of the Commission's vote."

Of course, it is immaterial whether in carrying on the function of censor, the Commission may have been exceeding its statutory authority.  Its acts would still constitute state action.  *Ex parte Young,* 209 U. S. 123.  The issue of statutory authority was not raised or argued in this litigation.

Our holding that the scheme of informal censorship here constitutes state action is in no way inconsistent with *Standard Computing Scale Co.* v. *Farrell,* 249 U. S. 571.  In that case it was held that a bulletin of specifications issued by the State Superintendent of Weights and Measures could not be deemed state action for Fourteenth Amendment purposes because the bulletin was purely advisory; the decision turned on the fact that the bulletin was not coercive in purport.

has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.

What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned. Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. See *Near* v. *Minnesota,* 283 U. S. 697; *Lovell* v. *Griffin,* 303 U. S. 444, 451; *Schneider* v. *State,* 308 U. S. 147, 164; *Cantwell* v. *Connecticut,* 310 U. S. 296, 306; *Niemotko* v. *Maryland,* 340 U. S. 268, 273; *Kunz* v. *New York,* 340 U. S. 290, 293; *Staub* v. *Baxley,* 355 U. S. 313, 321. We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint.[10] *Kingsley*

---

[10] Nothing in the Court's opinion in *Times Film Corp.* v. *Chicago,* 365 U. S. 43, is inconsistent with the Court's traditional attitude of disfavor toward prior restraints of expression. The only question tendered to the Court in that case was whether a prior restraint was necessarily unconstitutional *under all circumstances.* In declining to hold prior restraints unconstitutional *per se,* the Court did not uphold the constitutionality of any specific such restraint. Furthermore, the holding was expressly confined to motion pictures.

*Books, Inc.,* v. *Brown,* 354 U. S. 436. The system at bar includes no such saving features. On the contrary, its capacity for suppression of constitutionally protected publications is far in excess of that of the typical licensing scheme held constitutionally invalid by this Court. There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable. Moreover, the Commission's statutory mandate is vague and uninformative, and the Commission has done nothing to make it more precise. Publications are listed as "objectionable" without further elucidation. The distributor is left to speculate whether the Commission considers his publication obscene or simply harmful to juvenile morality. For the Commission's domain is the whole of youthful morals. Finally, we note that although the Commission's supposed concern is limited to youthful readers, the "cooperation" it seeks from distributors invariably entails the complete suppression of the listed publications; adult readers are equally deprived of the opportunity to purchase the publications in the State. Cf. *Butler* v. *Michigan,* 352 U. S. 380.

The procedures of the Commission are radically deficient. They fall far short of the constitutional requirements of governmental regulation of obscenity. We hold that the system of informal censorship disclosed by this record violates the Fourteenth Amendment.

In holding that the activities disclosed on this record are constitutionally proscribed, we do not mean to suggest that private consultation between law enforcement officers and distributors prior to the institution of a judicial proceeding can never be constitutionally permissible. We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating

valid laws prohibiting obscenity. Where such consulta-
tion is genuinely undertaken with the purpose of aiding
the distributor to comply with such laws and avoid prose-
cution under them, it need not retard the full enjoyment
of First Amendment freedoms. But that is not this case.
The appellees are not law enforcement officers; they do
not pretend that they are qualified to give or that they
attempt to give distributors only fair legal advice. Their
conduct as disclosed by this record shows plainly that
they went far beyond advising the distributors of their
legal rights and liabilities. Their operation was in fact
a scheme of state censorship effectuated by extralegal
sanctions; they acted as an agency not to advise but to
suppress.

*Reversed and remanded.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I adhere to the
views I expressed in *Roth* v. *United States,* 354 U. S. 476,
508–514, respecting the very narrow scope of govern-
mental authority to suppress publications on the grounds
of obscenity. Yet as my Brother BRENNAN makes clear,
the vice of Rhode Island's system is apparent whatever
one's view of the constitutional status of "obscene" litera-
ture. This is censorship in the raw; and in my view the
censor and First Amendment rights are incompatible. If
a valid law has been violated, authors and publishers and
vendors can be made to account. But they would then
have on their side all the procedural safeguards of the Bill
of Rights, including trial by jury. From the viewpoint of
the State that is a more cumbersome procedure, action on
the majority vote of the censors being far easier. But the
Bill of Rights was designed to fence in the Government

and make its intrusions on liberty difficult and its interference with freedom of expression well-nigh impossible.

All nations have tried censorship and only a few have rejected it. Its abuses mount high. Today Iran censors news stories in such a way as to make false or misleading some reports of reputable news agencies. For the Iranian who writes the stories and lives in Teheran goes to jail if he tells the truth. Thus censorship in Teheran has as powerful extralegal sanctions as censorship in Providence.

The Providence regime is productive of capricious action. A five-to-four vote makes a book "obscene." The wrong is compounded when the issue, though closely balanced in the minds of sophisticated men, is resolved against freedom of expression and on the side of censorship. Judges, to be sure, often disagree as to the definition of obscenity. But an established administrative system that bans book after book, even though they muster four votes out of nine, makes freedom of expression much more precarious than it would be if unanimity were required. This underlines my Brother BRENNAN's observation that the Providence regime "provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter." Doubts are resolved against, rather than for, freedom of expression.

The evils of unreviewable administrative action of this character are as ancient as dictators. George Kennan, Siberia and the Exile System (U. of Chi. 1958) p. 60, gives insight into it:

> "Mr. Boródin, another Russian author and a well-known contributor to the Russian magazine *Annals of the Fatherland,* was banished to the territory of Yakútsk on account of the alleged 'dangerous' and 'pernicious' character of a certain manuscript found in his house by the police during a search. This

manuscript was a spare copy of an article upon the economic condition of the province of Viátka, which Mr. Boródin had written and sent to the above-named magazine, but which, up to that time, had not been published. The author went to Eastern Siberia in a convict's gray overcoat with a yellow ace of diamonds on his back, and three or four months after his arrival in Yakútsk he had the pleasure of reading in the *Annals of the Fatherland* the very same article for which he had been exiled. The Minister of the Interior had sent him to Siberia merely for having in his possession what the police called a 'dangerous' and 'pernicious' manuscript, and then the St. Petersburg committee of censorship had certified that another copy of that same manuscript was perfectly harmless, and had allowed it to be published, without the change of a line, in one of the most popular and widely circulated magazines in the empire."

Thus under the Czars an all-powerful elite condemned to the Siberia of that day an author whom a minority applauded. Administrative fiat is as dangerous today as it was then.

Mr. Justice Clark, concurring in the result.

As I read the opinion of the Court, it does much fine talking about freedom of expression and much condemning of the Commission's overzealous efforts to implement the State's obscenity laws for the protection of Rhode Island's youth but, as if shearing a hog, comes up with little wool. In short, it creates the proverbial tempest in a teapot over a number of notices sent out by the Commission asking the cooperation of magazine distributors in preventing the sale of obscene literature to juveniles.

The storm was brewed from certain inept phrases in the notices wherein the Commission assumed the prerogative of issuing an "order" to the police that certain publications which it deemed obscene are "not to be sold, distributed or displayed to youths under eighteen years of age" and stated that "[t]he Attorney General will act for us in case of non-compliance." But after all this expostulation the Court, being unable to strike down Rhode Island's statute, see *Alberts* v. *California,* 354 U. S. 476 (1957), drops a demolition bomb on "the Commission's practice" without clearly indicating what might be salvaged from the wreckage. The Court in condemning the Commission's practice owes Rhode Island the duty of articulating the standards which must be met, lest the Rhode Island Supreme Court be left at sea as to the appropriate disposition on remand.

In my view the Court should simply direct the Commission to abandon its delusions of grandeur and leave the issuance of "orders" to enforcement officials and "the State's criminal regulation of obscenity" to the prosecutors, who can substitute prosecution for "thinly veiled threats" in appropriate cases. See *Alberts* v. *California, supra.* As I read the opinion this is the extent of the limitations contemplated by the Court, leaving the Commission free, as my Brother HARLAN indicates, to publicize its findings as to the obscene character of any publication; to solicit the support of the public in preventing obscene publications from reaching juveniles; to furnish its findings to publishers, distributors and retailers of such publications and to law enforcement officials; and, finally, to seek the aid of such officials in prosecuting offenders of the State's obscenity laws. This Court has long recognized that "the primary requirements of decency may be enforced against obscene publications." *Near* v. *Minnesota,* 283 U. S. 697, 716 (1931); see *Kingsley Books, Inc.,*

v. *Brown*, 354 U. S. 436 (1957). Certainly in the face of rising juvenile crime and lowering youth morality the State is empowered consistent with the Constitution to use the above procedures in attempting to dispel the defilement of its youth by obscene publications. With this understanding of the Court's holding I join in its judgment, believing that the limitations as outlined would have little bearing on the efficacy of Rhode Island's law.

Mr. Justice Harlan, dissenting.

The Court's opinion fails to give due consideration to what I regard as the central issue in this case—the accommodation that must be made between Rhode Island's concern with the problem of juvenile delinquency and the right of freedom of expression assured by the Fourteenth Amendment.

Three reasons, as I understand the Court's opinion, are given for holding the particular procedures adopted by the Rhode Island Commission under this statute, though not the statute itself, unconstitutional: (1) the Commission's activities, carried on under color of state law, amount to a scheme of governmental censorship; (2) its procedures lack adequate safeguards to protect nonobscene material against suppression; and (3) the group's operations in the field of youth morality may entail depriving the adult public of access to constitutionally protected material.

In my opinion, none of these reasons is of overriding weight in the context of what is obviously not an effort by the State to obstruct free expression but an attempt to cope with a most baffling social problem.

I.

This Rhode Island Commission was formed for the laudable purpose of combatting juvenile delinquency. While there is as yet no consensus of scientific opinion on the

causal relationship between youthful reading or viewing of "the obscene" and delinquent behavior, see Green, Obscenity, Censorship, and Juvenile Delinquency, 14 U. of Toronto L. J. 229 (1962), Rhode Island's approach to the problem is not without respectable support, see S. Rep. No. 2381, 84th Cong., 2d Sess. (1956); Kefauver, Obscene and Pornographic Literature and Juvenile Delinquency, 24 Fed. Prob. No. 4, p. 3 (Dec. 1960). The States should have a wide range of choice in dealing with such problems, *Alberts* v. *California,* decided with *Roth* v. *United States,* 354 U. S. 476 (separate opinion of the writer, at 500–502), and this Court should not interfere with state legislative judgments on them except upon the clearest showing of unconstitutionality.

I can find nothing in this record that justifies the view that Rhode Island has attempted to deal with this problem in an irresponsible way. I agree with the Court that the tenor of some of the Commission's letters and reports is subject to serious criticism, carrying as they do an air of authority which that body does not possess and conveying an impression of consequences which by no means may follow from noncooperation with the Commission. But these are things which could surely be cured by a word to the wise. They furnish no occasion for today's opaque pronouncements which leave the Commission in the dark as to the permissible constitutional scope of its future activities.

Given the validity of state obscenity laws, *Alberts* v. *California, supra,* I think the Commission is constitutionally entitled (1) to express its views on the character of any published reading or other material; (2) to endeavor to enlist the support of law enforcement authorities, or the cooperation of publishers and distributors, with respect to any material the Commission deems obscene; and (3) to notify publishers, distributors, and members of the public

with respect to its activities in these regards; but that it must take care to refrain from the kind of overbearing utterances already referred to and others that might tend to give any person an erroneous impression as to either the extent of the Commission's authority or the consequences of a failure to heed its warnings. Since the decision of the Court does not require reinstatement of the broad injunction issued by the trial court,[1] and since the majority's opinion rests on the invalidity of the particular procedures the Commission has pursued, I find nothing in that opinion denying the Commission the right to conduct the activities, just enumerated, which I believe it is constitutionally entitled to carry on.

## II.

It is said that the Rhode Island procedures lack adequate safeguards against the suppression of the non-obscene, in that the Commission may pronounce publications obscene without any prior judicial determination or review. But the Commission's pronouncement in any given instance is not self-executing. Any affected distributor or publisher wishing to stand his ground on a particular publication may test the Commission's views by way of a declaratory judgment action [2] or suit for injunctive relief or by simply refusing to accept the Com-

---

[1] The appellees were enjoined "from directly or indirectly notifying book and magazine wholesale distributors and retailers that the Commission has found objectionable any specific book or magazine for sale, distribution or display; said injunction . . . [to] apply whether such notification is given directly to said book and magazine wholesale distributors and retailers, or any of them, either orally or in writing, or through the publication of lists or bulletins, and irrespective of the manner of dissemination of such lists or bulletins."

[2] Rhode Island Gen. Laws (Supp. 1961), Tit. 9, c. 30 (Uniform Declaratory Judgments Act).

mission's opinion and awaiting criminal prosecution in respect of the questioned work.

That the Constitution requires no more is shown by this Court's decision in *Times Film Corp.* v. *Chicago,* 365 U. S. 43. There the petitioner refused to comply with a Chicago ordinance requiring that all motion pictures be examined and licensed by a city official prior to exhibition. It was contended that regardless of the obscenity *vel non* of any particular picture and the licensing standards employed, this requirement in itself amounted to an unconstitutional prior restraint on free expression. Stating that there is no "absolute freedom to exhibit, at least once, any and every kind of motion picture," 365 U. S., at 46, this Court rejected that contention and remitted the petitioner to a challenge of an application of the city ordinance to specific films. The Court thus refused to countenance a "broadside attack" on a system of regulation designed to prevent the dissemination of obscene matter.

Certainly with respect to a sophisticated publisher or distributor,[3] and shorn of embellishing mandatory language, this Commission's advisory condemnation of particular publications does not create as great a danger of restraint on expression as that involved in *Times Film,* where exhibition of a film without a license was made a crime.[4] Nor can such danger be regarded as greater than that involved in the preadjudication impact of the sequestration procedures sustained by this Court in *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436. For

---

[3] The publishers and distributors involved in this case are all, so far as this record shows, substantial business concerns, presumably represented by competent counsel, as were the appellants here.

[4] It seems obvious that in a nonlicensing context the force of *Times Film* is not lessened by the circumstance that in this case books rather than motion pictures are involved.

here the Commission's action is attended by no legal sanctions and leaves distribution of the questioned material entirely undisturbed.

This case bears no resemblance to what the Court refused to sanction in *Marcus* v. *Search Warrant of Property,* 367 U. S. 717. There police officers, pursuant to Missouri procedures, seized in a one-day foray under search warrants some 11,000 copies of 280 publications found at the appellants' various places of business and believed by the officers to be obscene. The state court later found that only 100 out of the 280 publications actually were obscene. In holding "that Missouri's procedures as applied . . . lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled," 367 U. S., at 731, the Court emphasized the historical connection between the search and seizure power and the stifling of liberty of expression. The Missouri warrants gave the broadest discretion to each executing officer and left to his *ad hoc* judgment on the spot, with little or no opportunity for discriminating deliberation, which publications should be seized as obscene. Since "there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity," 367 U. S., at 732, it was to be expected that much of the material seized under these procedures would turn out not to be obscene, as indeed was later found by the state court in that very case.

No such hazards to free expression exist in the procedures I regard as permissible in the present case. Of cardinal importance, dissemination of a challenged publication is not physically or legally impeded in any way. Furthermore, the advisory condemnations complained of are the product not of hit-or-miss police action but of a deliberative body whose judgments are limited by stand-

ards embraced in the State's general obscenity statute, the constitutionality of which is not questioned in this case.

The validity of the foregoing considerations is not, in my opinion, affected by the state court findings that one of appellants' distributors was led to withdraw publications, thought obscene by the Commission, because of fear of criminal prosecution. For this record lacks an element without which those findings are not of controlling constitutional significance in the context of the competing state and individual interests here at stake: there is no showing that Rhode Island has put any roadblocks in the way of any distributor's or publisher's recourse to the courts to test the validity of the Commission's determination respecting any publication, or that the purpose of these procedures was to stifle freedom of expression.

It could not well be suggested, as I think the Court concedes, that a prosecutor's announcement that he intended to enforce strictly the obscenity laws or that he would proceed against a particular publication unless withdrawn from circulation amounted to an unconstitutional restraint upon freedom of expression, still less that such a restraint would occur from the mere existence of a criminal obscenity statute. Conceding that the restrictive effect of the Commission's procedures on publishers, and *a fortiori* on independent distributors, may be greater than in either of those situations, I do not believe that the differences are of constitutional import, in the absence of either of the two factors indicated in the preceding paragraph. The circumstance that places the Commission's permissible procedures on the same constitutional level as the illustrations just given is the fact that in each instance the courts are open to the person affected, and that any material, however questionable, may be freely sponsored, circulated, read, or viewed until judicially condemned.

In essence what the Court holds is that these publishers or their distributors need not, with respect to any material challenged by the Commission, vindicate their right to its protection in order to bring the Constitution to their aid. The effect of this holding is to cut into this effort of the State to get at the juvenile delinquency problem, without this Court or any other ever having concretely focused on whether any of the specific material called in question by the Commission is or is not entitled to protection under constitutional standards established by our decisions.[5]

This seems to me to weight the accommodation which should be made between the competing interests that this case presents entirely against the legitimate interests of the State. I believe that the correct course is to refuse to countenance this "broadside attack" on these state procedures and, with an appropriate *caveat* as to the character of some of the Commission's past utterances, to remit the appellants to their remedies respecting particular publications challenged by the Commission, as was done in the *Times Film* case. Putting these publishers and their distributors to the pain of vindicating challenged materials is not to place them under unusual hardship, for as this Court has said in another context, "Bearing the discomfiture and cost" even of "a prosecution for crime . . . [though] by an innocent person is one of the painful obligations of citizenship." *Cobbledick* v. *United States,* 309 U. S. 323, 325.

## III.

The Court's final point—that the Commission's activities may result in keeping from the adult public protected material, even though suppressible so far as youth is con-

---

[5] In their Reply Brief (p. 4) appellants acknowledge: "We have never attempted to deal with the question of obscenity or non-obscenity of Appellants' books."

cerned—requires little additional comment. It is enough to say that such a determination should not be made at large, as has been done here. It should await a case when circumspect judgment can be brought to bear upon particular judicially suppressed publications.

Believing that the Commission, once advised of the permissible constitutional scope of its activities, can be counted on to conduct itself accordingly, I would affirm the judgment of the Rhode Island Supreme Court. Cf. *United States* v. *Haley,* 371 U. S. 18.