**AMALGAMATED CLOTHING WORKERS OF AMERICA, RANK AND FILE COMMITTEE et al.**

**v.**

**AMALGAMATED CLOTHING WORKERS OF AMERICA, PHILADELPHIA JOINT BOARD et al.**

**Civ. A. No. 71–2144.**

United States District Court, E. D. Pennsylvania.

· Sept. 10, 1971.

---

6. *See* n. 1, *supra*.

David Cohen, Harry Lore, Philadelphia, Pa., for plaintiffs.

Jerome L. Markowitz, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

JOHN W. LORD, Jr., Chief Judge.

The Court has been called upon by plaintiffs, self-styled dissident members of the defendant union, to enjoin a nominating meeting scheduled for September 8, 1971,[1] at which business agent candidates may be nominated; to enjoin the enforcement of certain articles and sections of Union bylaws; and other declaratory and injunctive relief. The thrust of plaintiffs' complaint is that the articles complained of vest in the Union's Board of Directors such power over elections as to have a chilling effect on the First Amendment rights of the plaintiffs; and that eligibility requirements for nomination are re-

---

1. A full evidentiary hearing was held on September 7, 1971, at which time the Court enjoined the holding of such a meeting until a full opinion could be filed. The filing of this opinion will, therefore, effectively dissolve the preliminary injunction.

pugnant to the Labor-Management Reporting and Disclosure Act, 73 Stat. 519 (1959), 29 U.S.C.A. § 401 et seq. (hereinafter LMRDA).

Because the bylaws complained of are alleged to violate not only sections of the LMRDA, but also certain First Amendment rights secured outside the Act, we shall examine each bylaw and the claim made under it.

Article XII, § 2[2] states, "That the Board of Directors shall supervise all nominations and meetings and elections under the direction of the President and Secretary of the Joint Board." We can only assume, inasmuch as it is not set out, that the complaint with regard to this section deals with the manner in which an earlier nominating session was adjourned without a dissident candidate being nominated. (This meeting was rescheduled for September 8, 1971, the meeting enjoined by our order.) At the prorogued meeting, which both factions agree was adjourned because of disorders arising on the floor and podium, the incumbent agent had been nominated to succeed himself, and the dissident candidate's drive cut off by the adjournment.

■ It is unquestioned that a primary purpose of the LMRDA was to guarantee to union members the same rights of association, speech and election which we all share. Title I of the Act, frequently referred to as the bill of rights section, was introduced as an amendment to the LMRDA by Senator McClellan, who, during debate on § 101 (a) (1) said:

"The select Committee found time and again the denial of the right to vote, the denial of the right to work, the de-

nial of the right to have a voice, the denial of the basic human rights on which our very freedom was founded."[3]

He had referred to it earlier in the Senate debates as:

"[B]ring[ing] to the conduct of union affairs and to union members the reality of some of the freedoms from oppression that we enjoy as citizens by virtue of the Constitution of the United States, which incidentally does not make an exception for union members."[4]

■ Recognizing the full weight of the Congressional intent that this legislation was intended to protect the unionist in his choice of leaders, we feel that no danger to this choice exists here. Not only was the dissident candidate unable to be nominated, his incumbent opponent's nomination was also voided at the disrupted meeting by the fact of its adjournment. Both candidates may now present themselves to the union membership for nomination and possible election.

The next section complained of, XII § 5, states in full:

"That no candidate running for office in the Philadelphia Joint Board or affiliated local union shall be a party to or attend any gathering where refreshments are served free. A member's ability and record should be the only basis upon which he seeks to be elected, and it is detrimental and against the dignity of the office to spend money to finance a campaign to be elected. Any candidate found guilty of infraction of this ruling will have his name stricken from the ballot and his candidacy nullified."[5]

---

2. All article and section references are to the bylaws, unless otherwise noted.

3. Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1103.

4. *Id.* at 1098.

5. *See also* Article XII, § 7 which states: "No collection shall be made in any shop for campaign purposes by any candidate or supporter of any candidate. The practice of making collections for flowers or for any other display shall come under the rules as provided by the Joint Board in regards to collections in the shops." A discussion of this section is implicit in our review of Article XII, § 5, infra.

The plaintiffs admit that this ruling applies equally to all candidates, but specifically complain that because "[No] candidate may attend any meeting or gathering where refreshments are freely offered * * * [this provision violates] the First and Fifth Amendments of the United States Constitution as well as § 411(a) (1) and (2) of the Bill of Rights Section of the Landrum-Griffin Act." Plaintiffs' memorandum of law, pp. 1 and 2.

We fail to see how a rule against a candidate, whether incumbent or dissident, serving refreshments, attending a meeting where they are served, or raising money for a campaign violates the rights of the plaintiffs. They are still free "to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws." Labor-Management Reporting and Disclosure Act, 29 U.S.C.A. § 411 (a) (1). Nor do we see how these rules violate the right of "[e]very member of any labor organization [to] have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; * * * " *Id.* at § 411(a) (2). Members are still free to campaign for office, express opinions, attend meetings, and make known their displeasure. They are forbidden only to raise campaign funds and serve refreshments at meetings. While such may go against our knowledge of the American campaign tradition, we do not feel that it violates either the Constitution or the Act.

Article XII, § 6, the next bylaw attacked, states that "Any leaflet, letter or card printed for distribution for campaign purposes must first be presented to the Board of Directors." Plaintiffs have cited Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963) for the unexceptionable proposition that "freedoms of expression * * * are vulnerable to gravely damaging yet barely visible encroachments." Here, however, the dissidents have made no offering of any form of discrimination. The Board merely asks that the material be submitted to it: there is no power of censorship, nor has there been any attempt to forbid or interdict the distribution of the materials to the membership.

The only allegations of "intimidation" were statements by the dissident candidate for the position of business agent that the incumbent failed to represent union members vigorously enough in confrontations with members of management. This was also the only offering of a curtailment of freedom of speech. We feel that this is, at best, a failing on the part of the business agent which may be remedied at the next election, or, at worst, the dissatisfaction which any candidate feels for the performance of his incumbent opponent.

We will not prolong this section of our opinion by distinguishing each of plaintiffs' cases. They are cited in support of the proposition that these sections of the bylaws "sweep too broadly" and therefore inhibit First Amendment freedoms, which we have above found not to be so.

Finally, plaintiffs contend that the requirement that nominations be by twenty-five percent of the membership in attendance "constitutes a denial of equal protection of the laws since it places an unequal burden on minority groups within the union by requiring an unreasonable show of strength, in opposition to union leadership, to be openly displayed." Plaintiffs memorandum of law, p. 5.[6] Plaintiffs reliance upon Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), is misplaced. There the Court struck down provisions of the Ohio Election Law, which had as its purpose preventing minority parties and independent candidates from having a place on the ballot. Here, any

6. During extensive questioning by the Court at the evidentiary hearing, it was admitted that no intimidation had taken place, nor had any been threatened.

candidate who can persuade one-quarter of his fellow union members to vote for him is assured a place on the ballot.

In Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), plaintiffs attacked, *inter alia*, the nominating procedures of their union.

"The result of their allegations here, however, is an attempt to sweep into the ambit of their right to sue in federal court if they are denied an equal opportunity to nominate candidates under § 101(a) (1), a right to sue if they are not allowed to nominate anyone they choose regardless of his eligibility and qualifications under union restrictions. But Title IV, not Title I, sets standards for eligibility and qualifications of candidates and officials and provides its own separate and different administrative and judicial procedure for challenging those standards. And the equal-rights language of § 101(a) (1) would have to be stretched far beyond its normal meaning to hold that it guarantees members not just a right to 'nominate candidates,' but a right to nominate anyone, without regard to valid union rules." *Id.* at 138, 85 S.Ct. at 295.

The district court had found itself without jurisdiction, 221 F.Supp. 545 (S.D. N.Y.); the appellate court reversed, 324 F.2d 486 (2nd Cir. 1963). In upholding the district court's finding, the high Court stated:

"Whether the eligibility requirements set by the union's constitution and bylaws were reasonable and valid is a question separate and distinct from whether the right to nominate on an equal basis given by § 101(a) (1) was violated. The District Court therefore was without jurisdiction to grant the relief requested * * *." *Id.* 379 U.S. at 139, 85 S.Ct. at 296.

One commentator, writing shortly after the enactment into law of the LMRDA, noted that:

"Judges need no longer be hesitant, nor can they be half-hearted, for Con-gress has charged them with the responsibility of insuring a 'fair election.' * * * A 'fair election' within the meaning of the statute is one in which the basic statutory standards have been observed at every stage of the process. The courts * * * must therefore be sensitive to the importance of details and make close inquiry into every claimed defect to discover its actual importance on the process. The test is * * * whether the defect * * * violates the statutory standards." [7]

We have carefully considered each claimed defect, and find, in light of the statutory history, Congressional intent, and Supreme Court interpretation, that we are without jurisdiction to adopt any of the claimed defects offered by the plaintiffs and use them to permanently enjoin the application of articles or bylaws of the union, or the conducting of union elections.

---

7. Judicial Regulation of Union Elections, Summers, 70 Yale L.J. 1221, 1256–1257 (1961).