[Crim. No. 43801. Second Dist., Div. Three. Oct. 17, 1983.]

In re STEVEN STEINBERG on Habeas Corpus.

COUNSEL

Yvonne M. Renfrew for Petitioner.

Ralph Jonas, Charles R. Walker and Fred Okrand as Amici Curiae on behalf of Petitioner.

John H. Larson, County Counsel, and Sterling Honea, Deputy County Counsel, for Respondent.

Jett, Clifford & Laquer and Robert Scot Clifford for Real Party in Interest.

OPINION

LUI, J.—

SUMMARY

This petition challenges the propriety of the juvenile court's order seeking to obtain petitioner Stephen Steinberg's[1] videotapes for viewing on grounds

---

[1]The petition for writ of habeas corpus was filed on behalf of Steinberg by his counsel, Yvonne Renfrew in her own name. Since Steinberg is the subject of the .habeas corpus petition, we will treat him and not his counsel as the petitioner in this opinion.

that the order violates Steinberg's First Amendment rights and constitutes an impermissible prior restraint.

██  Steinberg had gained access to a juvenile placement facility to make several documentary films based on his agreement to permit others to oversee his film project "in terms of concept and final editing." Although we grant Steinberg's writ of habeas corpus and vacate the juvenile court's orders holding him in contempt for failing to allow it to view the unedited tapes, we determine that Steinberg agreed to a review of the final version of such films by the placement facility, the probation department and the juvenile court. Therefore, our decision to vacate the contempt orders does not absolve Steinberg of the duty to submit the final versions of the videotape documentaries to the placement facility, the probation department, and the juvenile court for review prior to public dissemination. Any objection to the content of the videotapes must be based on grounds that the content would be harmful or detrimental to the minors depicted therein. The juvenile court may use its contempt power to enforce Steinberg's compliance with his agreement.

### FACTUAL AND PROCEDURAL BACKGROUND

In late June or early July of 1981, Steinberg, a student filmmaker and former social worker, began discussions with Sharon Watson, the executive director of Los Angeles Florence Crittenton Services (Crittenton), which is an adolescent, residential placement and treatment center for young women, their babies, and families. The Los Angeles County Department of Social Services regularly places dependent children at Crittenton pursuant to the order of the juvenile court. Steinberg and Watson discussed the possibility of Steinberg's production of two videotape documentary films. The first videotape was to be a 5-10 minute public relations documentary for Crittenton; the second was to be a 20-30 minute educational documentary about a particular and specifically named family which was experiencing a family crisis.

Details of the videotape project were set out in letters from Steinberg to Watson. Steinberg's letter of July 21, 1982, specifically acknowledged Watson's concern for the approval of the juvenile court and Crittenton's board of directors for the project. In fact, Steinberg's letter of January 9, 1982, states: "Court clearance—as we discussed, nothing can happen without this approval. If this could be determined as soon as possible, it would be very helpful to me (it may mean going ahead with shooting with only part of the family, or shooting certain family members from their backside). Please let me know if there is anything I can do concerning explaining the intentions of this documentary to probation/court."

In a letter dated January 15, 1982, from Jane Turner, community affairs representative of the Los Angeles County Probation Department to Judge H. Randolph Moore, Jr., Presiding Judge of the Los Angeles County Juvenile Court, Turner attached a separate letter indicating that the parents of the family in question had consented to Steinberg's videotaping. There is no indication that the minors who were to be taped had any personal objection to the taping. Based on the letters from Watson and Turner, Judge Moore approved Steinberg's videotape project on January 27, 1982. After stating the details of the project as he understood them and listing the names of the minors to be filmed, Judge Moore concluded by simply stating "[p]ermission to complete your project is hereby granted."

On March 2, 1982, Steinberg screened a small portion of some 10 hours of his videotapes for representatives of the probation department and Crittenton. The probation department's complaints that the footage put them in a bad light reached Judge Moore who then sought to obtain the videotape for viewing. When Steinberg rejected the request to turn over the videotapes, Judge Moore met with the county counsel to determine whether that office would represent the juvenile court in seeking to obtain possession of the videotapes for viewing. County counsel declined representation and suggested that other counsel be appointed for one of the dependent children depicted in the videotapes and that the videotapes be requested on the child's behalf. Judge Moore then appointed Attorney Robert Scot Clifford to represent Yvette, one of the children of the family.

On June 30, 1982, Clifford filed a petition to modify previous order in the Matter of Yvette V., juvenile case No. J011177. In connection with this petition, a subpoena duces tecum was served on Steinberg, ordering him to appear before Judge Moore with the videotapes. Steinberg filed a motion to quash the subpoena and for a protective order. Prior to the hearing on the motion to quash, Steinberg moved to disqualify Judge Moore from hearing his motion to quash the subpoena. During the hearing seeking to disqualify him under section 170 of the Code of Civil Procedure, Judge Moore testified: "See, if you understand where I am coming from, Ms. Renfrew [petitioner's counsel], I am really not concerned with what Mr. Steinberg does with the film. If there is nothing detrimental in it, as far as the kids are concerned, whatever he wants to do with it is fine with me. I really don't care. It does not concern me. All I want to do is to be sure that there is nothing in the film that would harm or be detrimental to any of the youngsters who are wards of the Juvenile Court, who are in this film; that's all." Following the hearing, Judge Richard Lavine disqualified Judge Moore from hearing the motion to quash under section 170, subdivision (a)(5), of the Code of Civil Procedure.

Subsequently, the motion to quash was heard and denied by Judge William Hogoboom. Steinberg was ordered to appear with his videotapes on January 4, 1983, "for inspection by the court at an in camera hearing to determine the propriety of any further order of the Juvenile Court authorizing or limiting the publication of any of the materials described in the subpoena duces tecum in the best interests of the minor."

Steinberg appeared before Judge Moore on January 7, 1983. After asserting that Judge Moore had been disqualified to preside at the *in camera* hearing as well, Steinberg was ordered to appear before Judge Everett Ricks. When Steinberg refused to produce the videotapes to Judge Ricks, he was held in contempt of court and sentenced to five days in the county jail.

Steinberg's counsel filed the petition for writ of habeas corpus and a request for a temporary stay order which is the subject of this petition. We issued a temporary stay in order to consider the petition. On April 8, 1983, we denied the petition. Judge Ricks ordered Steinberg to appear before him on April 25, 1983, to produce the videotapes. Thereafter, Renfrew filed a petition for writ of habeas corpus and request for temporary stay in our Supreme Court. Our Supreme Court granted a temporary stay order, which was to remain in effect until the final determination of the petition. Subsequently, the Supreme Court ordered the superior court to show cause before this court why the relief prayed for should not be granted. In compliance with our Supreme Court's direction, we issued an alternative writ and set the matter for hearing.

## DISCUSSION

### I

*Absent an Agreement to the Contrary, the Juvenile Court's Demand for Interim Editing Imposes an Unconstitutional Prior Restraint on Steinberg*

Steinberg complains of an infringement of his rights under the First Amendment of the United States Constitution. As shall be discussed below in section II, Steinberg had no right to obtain the information without juvenile court approval. But, having obtained that approval, he has a right to disseminate the information as he sees fit, provided he complies with any agreement that he made in obtaining the juvenile court's approval.

The contempt order issued by the court below acts as a prior restraint on speech because it stops Steinberg from completing the film until he allows the juvenile court to view it. ■ "'Any system of prior restraints of

expression comes to this Court bearing a heavy presumption against its constitutional validity.'" (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [29 L.Ed.2d 822, 824, 91 S.Ct. 2140], quoting *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 593, 83 S.Ct. 631].) With this assertion, the Supreme Court cleared the way for the publishing of the Pentagon papers, holding that the burden of showing sufficient justification for the imposition of such a restraint had not been met by the government.

In *Goldblum* v. *National Broadcasting Corp.* (9th Cir. 1978) 584 F.2d 904, the Ninth Circuit vacated the lower court's order that required the National Broadcasting Company (NBC) to produce a motion picture to the court so that it could be viewed for inaccuracies. The respondent, Stanley Goldblum, sought to enjoin the impending broadcast of the docudrama. The picture was based on events surrounding manipulations in an extensive security and insurance fraud which caused the insolvency of the company of which he was a former executive officer. He contended that the presentation would be an inaccurate and false portrayal of the incident and his involvement in it. The Ninth Circuit concluded that the district court had sought the film only to determine whether or not to issue an injunction suspending the broadcast. Such an injunction would constitute a prior restraint on NBC which is presumptively unconstitutional and ordered the district court to vacate its production order.

Steinberg is also a producer of a "motion picture" which is being ordered into juvenile court for review. Understandably, the juvenile court seeks to have the film viewed for material harmful to the minors depicted. But, such an action would constitute a presumptively unconstitutional prior restraint which may only be overcome with sufficient justification.[2] However, we need not discuss the nature and extent of any justification in this opinion due to the existence of an agreement by Steinberg.

## II

*Steinberg's Agreement Gave the Juvenile Court the Right to View the Videotapes Prior to Their Completion*

The respondent court asserts that its order requesting a view of Steinberg's videotapes is in conformity with his agreement and that it granted

---

[2]Portions of the record suggest that the probation department was concerned about scenes which may have been critical to certain probation officers. The potential chilling effect of prior restraints becomes clear when the probation department's fear of criticism is permitted to be a potential reason for the demand for Steinberg's videotapes.

him permission to make the videotapes on the condition that the court had supervisory power over their preparation.

Respondent court points to the decisions in *Snepp* v. *United States* (1980) 444 U.S. 507 [62 L.Ed.2d 704, 100 S.Ct. 763], and *United States* v. *Marchetti* (4th Cir. 1972) 466 F.2d 1309, as examples of decisions upholding agreements in the face of First Amendment challenges. In each of these cases, former Central Intelligence Agency employees were seeking to publish information obtained in their former capacities. The employees had previously signed express secrecy agreements as a condition of employment, promising not to publish any information relating to or learned at the agency without prior approval. Had these employees not signed the agreements expressly providing for prepublication review, they would not have been employed and would not have had access to the information they sought to publish. The prior restraints on publication in these cases[3] were therefore upheld since the government had a *contractual right* to impose such a restraint.

In the present case, Steinberg's agreement was to allow review and editing of the final version of the tapes, but not editing and review prior to their completion.

The Los Angeles County Superior Court Juvenile Court Judicial Manual (JCJM), section 8.100 sets out the juvenile court's policy regarding the photographing and audio or visual recording of minors in court-ordered placements as follows: "No still or motion pictures may be taken or voice recording made of minors who are in court-ordered placements . . . without the permission of the Presiding Judge of the Juvenile Court." This provision in the JCJM is consistent with the Welfare and Institutions Code[4] (principally §§ 346, 676 and 827) and rule 1311 of the California Rules of Court which provide that a juvenile court proceeding and documents are confidential.

The juvenile court has jurisdiction over minors who have been adjudged dependent, incorrigible, or delinquent children (§§ 300, 601 and 602). Section 346, dealing with closed hearings in dependency matters, and section 676, dealing with closed hearings in delinquency matters, both permit the presiding judicial officer to allow persons who are neither parents nor guardians to attend hearings provided they "have direct and legitimate interest in

---

[3]In *Snepp, supra,* 444 U.S. 507, one book had already been published. The court upheld the district court's decision to impose a constructive trust on its profits and a prior restraint on the publication of any further information.

[4]Hereinafter, all references shall be to the Welfare and Institutions Code unless otherwise specified.

the particular case or the work of the court." Section 827 empowers a judicial officer to allow persons to inspect the documents filed in a juvenile court proceeding, such as the probation officer's reports, upon the filing of a petition. These sections set forth the clear intention of the Juvenile Court Law to protect the confidentiality of minors.

Although there is no specific provision in the Welfare and Institutions Code concerning the right of a member of the public to gain access to a juvenile placement facility and to confer with minors concerning their status as wards or dependent children, the juvenile court has limited such access under the authority of the above-cited sections. Therefore, Steinberg could not have made the videotape recordings without the prior approval of Judge Moore.

In early discussions regarding his proposed documentaries, Steinberg recognized the need to obtain approval from a variety of sources in order to turn his proposal into a reality. He sought approval from the juvenile court, Crittenton, and the probation officers of the girls involved. The fact that approval was granted is not in question here.[5] The debate is over the amount of control the juvenile court retained when it granted Steinberg permission to shoot the videotapes. Judge Moore testified at the hearing on Steinberg's motion to disqualify him that he approved Steinberg's request for the project based upon letters from Watson and Turner.[6] But, these letters did not provide for the right of the juvenile court, Crittenton or the probation department to edit Steinberg's videotapes prior to their completion. The only reference to editing is found in Steinberg's letter to Watson wherein he said that "[Watson] and others would be able to oversee the project in terms of concept and *final* editing." (Italics added.)

It was Steinberg who made the ambiguous reference to "others" who would be able to oversee the project. A reasonable interpretation of this

[5]It is not clear from the record that Steinberg had approval from the probation officers.

[6]At oral argument, petitioner argued that any agreement he made regarding final editing was terminated as a result of Crittenton's failure to act promptly on his initial offer to film the documentaries. We find no indication in the record of such delays. Instead, the record reflects petitioner's second letter to Watson dated January 9, 1982, was followed almost immediately by Judge Moore's approval of the project on January 27, 1982.

Petitioner also claims that the agreement he made regarding final editing concerned persons other than the juvenile court. Although petitioner never contacted Judge Moore directly before the approval was granted and although the request for approval came from Probation Officer Turner, it is clear that Watson, Turner and Judge Moore all relied on petitioner's agreement to allow others to oversee the project in terms of concept and final editing. Even though Judge Moore was not a direct party to the agreement, the juvenile court is in the position of a third party beneficiary to Steinberg's agreement and has the authority pursuant to the Welfare and Institutions Code to protect the welfare of the minors depicted in the film. Thus the juvenile court could have denied the request or granted Steinberg's request subject to conditions. We reject Steinberg's notion that the court cannot enforce any agreement because of lack of privity of contract.

language is that Steinberg intended the court to be included in the term "others" since it was the court's approval he sought. However, Steinberg never gave the juvenile court the right it seeks here—to examine 10 hours of unedited videotapes "in order to determine what use, if any, should be made of the films and videotapes."

## DISPOSITION

In making the disposition indicated below, we hold that Steinberg's agreement to allow others to oversee his project in terms of concept and final editing is binding on him. Steinberg must consent to a review of the tapes by the probation department, Crittenton and the juvenile court prior to any public dissemination of the contents of such tapes whether or not they are embodied into the final version of the videotape documentaries. Any objections to the videotapes by the probation department, Crittenton or the juvenile court must be premised on content which would be harmful or detrimental to the minors depicted.

The respondent court is directed to vacate its order filed January 11, 1983, finding Steinberg in contempt and pronouncing sentence of five days in the county jail in the Los Angeles Juvenile Court case No. J-011-177 and to refrain from any further proceedings against Steinberg for refusing to submit the unedited videotapes for court review prior to their completion by Steinberg.

Klein, P. J., and Danielson, J., concurred.