**ILLINOIS ASSOCIATION OF REALTORS, et al., Plaintiffs,**

v.

**VILLAGE OF BELLWOOD, et al., Defendants.**

No. 78 C 3681.

United States District Court, N. D. Illinois, E. D.

June 16, 1981.

Jonathan T. Howe, Russell J. Hoover, Nicole Finitzo, Jenner & Block, Chicago, Ill., for plaintiffs.

Staehlin, Jontorni & Sullivan, F. Willis Caruso, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs brought this action for declaratory and injunctive relief challenging the constitutionality of two Bellwood ordinances. Before the court is plaintiffs' motion for summary judgment. The motion is granted.

The text of each ordinance is set forth in an appendix to this opinion, and we will therefore provide only a brief description here. Ordinance 77–23 is entitled "An Ordinance Regulating Real Estate Solicitation In The Village of Bellwood, Cook County, Illinois" and provides that before any real estate agent "enters into any form of real estate solicitation for listings in the Village of Bellwood," the agent must obtain a permit from the Village government. An application must be submitted to the Citizens Advisory Council ("the Council") which shall refuse to issue the permit "if in the opinion of the Council, said solicitation shall be deemed detrimental to the welfare of the community," in violation of Bellwood's anti-panic peddling ordinance or in violation of its Fair Housing Ordinance, "either in intent or effect." Solicitations made in violation of the ordinance subject the offender to a fine of not less than $50.00 nor more than $500.00 for each violation.

Ordinance 77–2 is entitled "An Ordinance Requiring Notification Of Intent To Sell Or Rent Residential Property" and requires that "all owners, agents, Brokers or any individual or legal entity having ownership or control of any residential property which is offered for sale or rental within the Village of Bellwood, must notify the Village . . . five days after the first real estate listing agreement is entered into, and or

public notification of such intent to sell is made, whichever shall occur first." Failure to give the notice subjects the offender to a fine of not less than $5.00 and not more than $500.00 for each day on which a violation occurs.

Plaintiff Illinois Association of Realtors is a not-for-profit corporation consisting of over 300 members who are engaged in the real estate business in Bellwood. The Association is dedicated, *inter alia*, to "recommend[ing] and promot[ing] legislation which will safeguard and advance the interest of property ownership" and to "provid[ing] a unified medium for real estate owners and those engaged in the real estate business whereby their interests may be safeguarded and advanced." By-Laws, ¶¶ 4, 8, Complaint, ¶ 4. Plaintiffs Francis M. Davies, John M. Davies and John M. Davies, III are engaged in the realty business in Bellwood under the name Davies Realty Shop. Plaintiff Ora Dee Williams is also a realtor in Bellwood and operates Donora Realty. The employees of both realty companies have submitted affidavits stating that they have "in the past engaged in lawful solicitation for real estate listings" and desire to continue "to engage in such solicitation in the future." Davies Affid., ¶ 4; Williams Affid., ¶ 4.[1]

Plaintiffs have filed a two-count complaint for declaratory and injunctive relief. In Count I, plaintiffs allege that Ordinance 77–13 is facially invalid in that it imposes an unconstitutional prior restraint on their efforts to solicit business and is impermissibly overbroad and vague. In Count II, plaintiffs claim that Ordinance 77–2 also is unconstitutionally vague and denies equal protection.[2]

## I. Ordinance 77–13

■ The kind of speech in which plaintiffs wish to engage and which Ordinance 77–13 regulates is entitled to First Amendment protection. *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia Board of Pharmacy v. Virginia Consumers Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Brokers play a key role in the real estate market by linking buyers with sellers. Although brokers do "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973), their efforts doubtlessly aid in "the proper allocation of resources" through enhancing the "flow of commercial information." *Virginia Board of Pharmacy*, 425 U.S. at 764, 96 S.Ct. at 1827. In serving the important societal goal of allocative efficiency, real estate solicitation merits some First Amendment protection.

The conclusion that plaintiffs' commercial speech merits some First Amendment protection does not answer the harder question, namely, how much protection. The Supreme Court has stated that for purposes of First Amendment analysis, "Certain features of commercial speech differentiates it from other varieties of speech in ways that suggest that 'a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired.'" *Friedman v. Rogers*, 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979). For this reason, the Court's "decisions dealing with more traditional First Amendment problems do not extend automatically to this as yet uncharted area." *Id.* at 11 n.9, 99 S.Ct. at 895 n.9. Further, the special characteristics of commercial speech may "allow [for] modes of regulation that might be impermissible in the realm of non-commercial expression." *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

---

1. Defendants have not challenged the standing of any of these plaintiffs to bring the present lawsuit.

2. Challenges to a statute as facially unconstitutional are appropriately made by summary judgment. *Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 633–635, 100 S.Ct. 826, 834–836, 63 L.Ed.2d 73 (1980). The only issue of fact relevant to this motion is whether plaintiffs intend to engage in conduct which the ordinances would regulate. Plaintiffs have submitted unopposed affidavits to this effect. See text at 1069.

In particular, the Court has noted that the traditional prohibition on prior restraints may not apply to regulation of speech which merely proposes a transaction. *Virginia Board of Pharmacy*, 425 U.S. at 772 n.24, 96 S.Ct. at 1831 n.24. The Court has also held that the overbreadth doctrine, a tool for judicial scrutiny of laws which implicate First Amendment interests, might not be applicable to commercial speech cases. Since two of plaintiffs' three arguments for invalidating Ordinance 77–13 are that it imposes an unconstitutional prior restraint and is impermissibly overbroad, we think it necessary to explore the applicability of these two limiting doctrines with respect to commercial speech cases in general and the instant case in particular.

■ As a preliminary matter, we note that Ordinance 77–13 imposes a prior restraint on the flow of market information. The elements of a prior restraint are (1) the person desiring to engage in the communication must apply to a government agent prior to engaging in the desired communication; (2) the government agent is empowered to grant or deny the application on the basis of the content of the proposed communication; (3) approval of the application depends on the agent's affirmative action; and (4) approval is not routinely granted but· is the result of the exercise of the agent's judgment. *Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1974); *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940). Each of these elements is present in Ordinance 77–13. Before soliciting, a broker must apply to the Village for a permit. The Village may grant or deny the application on the basis of content. Approval of a broker's request depends entirely on the Village's affirmative action. And finally,

approval is based on the Council's judgment as to whether the proposed solicitation would be "detrimental to the welfare of the community." [3]

Having determined that Ordinance 77–13 imposes a prior restraint, we now consider whether prior restraints are permissible in this area and, if so, under what circumstances they may be constitutionally imposed. In the more traditional First Amendment areas, the Court has held that "[P]rior restraints are not unconstitutional *per se*," but that there is a "heavy presumption against [their] constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); *Bantam Books v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *New York Times Co. v. U.S.*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971). In these cases, the Court has required that statutes allowing for censorship "first must fit within one of the narrowly defined exceptions to the prohibition against prior restraints and, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Southeastern Promotions*, 420 U.S. at 559, 95 S.Ct. at 1247; *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965).

■ Whether some forms of commercial speech such as real estate solicitation might be added to the few "narrowly defined exceptions to the prohibition against prior restraints" depends on the strength of the interests the government seeks to protect. Thus, for example, it has been suggested that the government may restrain the publication of certain information during time of war. *Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931).

**3.** Defendants argue that the ordinance does "no more than establish procedures which relate to when and where solicitation can take place and the manner in which it will be conducted. Def.'s Answer to Pltf.'s Motion, 4. The characterization of the ordinance as merely imposing a time, place and manner restriction cannot be taken seriously. The essence of a time, place and manner restriction is that it be executed "without reference to the content of the regulated speech." *Virginia Board of Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830. The explicit language of Ordinance 77–13 leaves no doubt that it is intended to regulate solicitations on the basis of their content, i. e., whether the content of the proposed speech would be "detrimental to the welfare of the community."

Similarly "the security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government." *Ibid.* The publication of the Pentagon Papers, on the other hand, did not implicate sufficiently important interests to justify censorship. *New York Times Co. v. U.S.*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). In stating that the prohibition against prior restraints may not apply to commercial speech cases, the Court cited a number of cases, all of which stand for the proposition that prior restraints are available to prevent what has been found to be false and misleading advertisements and trade practices.[4] While it appears that the government has strong enough interests to subject false and misleading commercial information to prior restraints, the issue before us is a different one: viz. whether the government may place prior restraints on the communication of apparently truthful commercial information which is otherwise deemed to be harmful.[5] There is no quick answer to this question, and it cannot be resolved by the papers before us. The strength of Bellwood's interests in promulgating Ordinance 77–13 can be determined only on the basis of more evidence than we presently have. However, the strength of the government's interests in suppression of speech is only one of two criteria for determining the validity of prior restraints. Additionally, "[A] system of prior restraint avoids constitutional infirmity only if it is accomplished with procedural safeguards that reduce the danger of censorship." *Southeastern Promotions*, 420 U.S. at 559, 95 S.Ct. at 1247; *Freedman v. Maryland*, 380 U.S. at 58, 85 S.Ct. at 738; *Bantam Books v. Sullivan*, 372 U.S. at 70–71, 83 S.Ct. at 639–640. These procedural safeguards include:

First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.

*Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. at 1247.

We understand defendants to argue that these procedural safeguards were designed to protect against state intrusions into kinds of speech which involve more significant First Amendment values than those implicated by the commercial speech at issue here. Hence, defendants conclude that in regulating the relatively less significant speech in which plaintiffs wish to engage, Ordinance 77–13 may dispense with these procedural safeguards.

We disagree. The procedural safeguards established in the prior restraint cases are founded on the concern for reducing as much as possible the risk of suppressing constitutionally protected speech. *Southeastern Promotions*, 420 U.S. at 559, 95 S.Ct. at 1246; *Freedman v. Maryland*, 380 U.S. at 57–59, 85 S.Ct. at 738–739. The government runs that risk, of course, whenever it engages in censorship. The risk may be greater where the speech involved is subject to greater protection. Conversely, when the censored speech is commercial in nature, the risk of suppressing protected

---

4. The Court's statement that the prohibition on prior restraints may not apply in the commercial speech context was accompanied by the citation to three cases, all of which involved the imposition of prior restraints on commercial speech found to be false or deceptive. See *Virginia Board of Pharmacy*, 425 U.S. at 772 n.24, 96 S.Ct. 1831 n.24. In *Donaldson v. Read Magazine*, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948), the Supreme Court upheld the Postmaster's ban on the mailing of certain material found to be part of a "scheme or device for obtaining money . . . by means of false or fraudulent pretenses . . . ." *Id.* at 180, 68 S.Ct.

at 593. In *FTC v. Standard Education Society*, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937), the Court upheld an FTC order forbidding pricing and advertising practices found by that agency to be misleading and deceptive. *E. F. Drew & Co. v. FTC*, 235 F.2d 735 (2d Cir. 1956) is to the same effect.

5. Defendants claim that the ordinance is intended to prevent "racial steering" in the Bellwood housing market. See *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

speech may lessen. But the risk does not disappear completely. When the censor becomes overzealous and the risk of suppressing constitutionally protected speech becomes a reality, the result is no less obnoxious to First Amendment values because the content of the speech happens to be commercial. Thus, the important point is not that the suppressed speech is commercial; the important point is that it is protected.

The Supreme Court has recognized that the censorship of any protected speech without the procedural safeguards is inconsistent with the First Amendment, even where the suppressed speech embodies less significant First Amendment values. Thus, in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), the Court held unconstitutional a statute allowing the Postmaster to return to the sender letters posted for the purpose of obtaining or seeking money for "obscene matter." The statute was defective, said the Court, since it imposed a prior restraint without the requisite safeguards mandated by *Freedman v. Maryland*, 400 U.S. at 417, 91 S.Ct. at 428. If a statute which restricts access to the mails of persons sending obscene materials—a form of communication not held in high constitutional repute—must contain the procedural safeguard, we have no doubt that similar safeguards must be employed in the case at bar.

■ We find that Ordinance 77–13 is utterly devoid of the procedural safeguards required of legislative enactments which impose a prior restraint. The ordinance does not place on the Village the burden of initiating enforcement proceedings or of proving that the solicitations are unprotected. Rather, the Council's decision appears to become effective without judicial approval. Nor does the statute provide for expedited decisions by the Council. On the con-

trary, Section IV of the ordinance states that the Council shall review the applications "only at its regular meetings." The Council may meet weekly or even monthly. We do not know. But regardless of the frequency of the meetings, the ordinance is inadequate in that it places the timing for making decisions entirely in the hands of the censor. Additionally, Section VII provides that "[N]o person shall file for said solicitation more than once in a six month period." Thus, taking into account the time the Council requires to reach a decision, plaintiffs may be prohibited from engaging in the desired communication for well over six months. Finally, the ordinance contains no provision for rapid judicial review.[6]

For these reasons, we conclude that Ordinance 77–13 imposes an unconstitutional prior restraint.

Plaintiffs also argue that the ordinance is overbroad. As noted above, the Council may refuse a permit if, in its "opinion," the proposed solicitation is "deemed to be detrimental to the welfare of the community . . . ." Plaintiff argues that this language gives the Council a mandate so broad as to enable it to "arbitrarily deny solicitation permits to those who would engage in protected speech." *International Society For Krishna Consciousness of Berkeley, Inc. v. Kearns*, 454 F.Supp. 116, 118 (E.D.Cal.1978). In reliance on the overbreadth doctrine, plaintiffs conclude that they are entitled to challenge the statute even though they have not demonstrated that their specific conduct would be protected by the First Amendment. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1976).

In the traditional First Amendment area, the Supreme Court has struck down statutes as overbroad which have given licen-

---

6. It may be argued that these requirements, soundly established as they are, ought to be read into the ordinance in order to save it. The Supreme Court has understandably shunned this approach. As it stated in *Freedman v. Maryland*, "How or whether Maryland is to incorporate the required procedural safeguards in the statutory scheme is, of course, for the State to decide." 380 U.S. at 60, 85 S.Ct. at 740. For the arguments against judicial rewriting of statutes, see generally, Comment, "The

sors too free a hand.[7] In *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Court held unconstitutional a Birmingham ordinance which granted the city the power to prohibit "any parade or procession or other public demonstration on the streets or other public ways of the city" if "in its judgment, the public welfare, peace, safety, health, decency, good order morals or convenience requires that it be refused." 394 U.S. at 149–150, 89 S.Ct. at 938. "This ordinance," said the Court, "fell squarely within the ambit of many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority, is unconstitutional." *Id.* at 150–151, 89 S.Ct. at 938.

In *Staub v. Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958), the Court struck down a Baxley ordinance which prohibited solicitation of memberships to organizations which required their members to pay dues or fees unless the Mayor and the City Council approved of "the character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare of the citizens of the City of Baxley." 355 U.S. at 315 n.1, 78 S.Ct. at 279 n.1. The Court ruled that the ordinance made the "peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official" and was therefore "unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." 355

U.S. at 322, 78 S.Ct. at 282. To the same effect, see *Kunz v. New York*, 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1950); *Largent v. Texas*, 318 U.S. 418, 422, 63 S.Ct. 667, 669, 87 L.Ed. 873 (1943); *Cantwell v. Connecticut*, 310 U.S. 296, 305–307, 60 S.Ct. 900, 904–905, 84 L.Ed. 1213 (1940); *Schneider v. State*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939); *Hague v. C.I.O.*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

The defect of the statutes in these cases was not only that they gave authorities the power to prohibit protected speech, but also that "[T]hey might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute." *Bates*, 433 U.S. at 380, 97 S.Ct. at 2707.

Notwithstanding the considerable line of cases striking down overbroad licensing statutes, the Supreme Court has indicated that the "justification for the application of the overbreadth analysis applies weakly, if at all, in the ordinary commercial context . . . [since] there are 'commonsense differences' between commercial speech and other varieties." *Id.* at 380–381, 97 S.Ct. at 2707. The Court has noted two "commonsense differences." First, commercial speech is more "durable" since, "as the *sine qua non* of commercial profits, there is little likelihood of it being chilled by proper regulation and foregone entirely." *Virginia Board of Pharmacy*, 425 U.S. at 772 n.24, 96 S.Ct. at 1831 n.24; *Bates*, 433 U.S. at 381,

First Amendment Overbreadth Doctrine," 83 H.L.R. 844, 891–901 (1970).

7. A statute which is overbroad is to be distinguished from one which is vague, though the two vices frequently have the same effect. Simply stated, an overbroad statute regulates too much speech. It may do so either by giving the state an overly intrusive, but nonetheless precise, mandate; or it may do so by phrasing the state's mandate so vaguely as to give the authorities discretion to overstep constitutional bounds. In the latter case, "The lack of determinate guidelines defining areas of impermissible intervention fosters erratic and perhaps censorial or selective decisionmaking on the

part of those who must apply overbroad penal or licensing laws in the first instance." "The First Amendment Overbreadth Doctrine," 83 H.L.R. at 872. This kind of overbroad statute is similar in operation and effect to a vague statute, since "[A]n element of latent vagueness is intrinsic in any overbroad statute when tests for excision of bad applications are ad hoc in nature." *Id.* at 873. The Bellwood ordinance and the ordinances at issue in *Shuttlesworth* and *Staub*, see text at 1072–1073, exhibit the latter type of overbreadth in that their potential for suppressing protected speech is the product of vague prescriptions.

97 S.Ct. at 2707. Second, it is more "objective" insofar as "[t]he truth of commercial speech . . . may be more easily verifiable by its disseminator than news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else." *Virginia Board of Pharmacy*, 425 U.S. at 772 n.24, 96 S.Ct. at 1830 n.24. In this way, "[C]oncerns for uncertainty in determining the scope of protection are reduced." *Bates*, 433 U.S. at 381, 97 S.Ct. at 2707.

With respect to some forms of regulation, the durability and objectivity of commercial speech may insure that less protected speech will be chilled by the threat of overbroad enforcement.[8] In such circumstances, the rationale for overbreadth analysis would disappear. This is not so, however, where commercial speech is regulated by an overbroad licensing statute. Such a statute may chill a substantial amount of protected speech, particularly where the speaker perceives that the licensing process is so costly, troublesome or futile that he would prefer to forego the speech entirely. The potential for chilling commercial speech aside, an overbroad licensing statute presents an even stronger reason for the application of overbreadth analysis. That is, statutes which allow for arbitrary licensing may result in an absolute prohibition of the regulated speech, regardless of the nature of that speech. The central vice of enactments like the one at bar is not that they chill speech by requiring a prediction of legality by the speaker, but rather that they condition legality on the judgment of the censor. The overbreadth of such ordinances

is not lessened by the nature of the speech it regulates. The overbreadth is, on the contrary, inherent in the nature of the regulation, i. e., standardless prior restraint.

For these reasons, we think that an overbreadth challenge is especially appropriate with respect to the Bellwood ordinance. We now address that challenge. The Supreme Court has indicated that in cases in which a commercial speaker may mount an overbreadth attack, "[t]he overbreadth of the statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Ohralik*, 436 U.S. at 462–463 n.20, 98 S.Ct. at 1922 n.20, quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). We have no difficulty in finding that Ordinance 77–13 is overbroad in a real and substantial way. The ordinance bestows absolutely uncontrolled discretion on the Council to determine whether the content of certain communications would be "detrimental to the welfare of the community." As with similar statutes the Court has invalidated,[9] the overly broad language in Ordinance 77–13 lays at the very heart of the ordinance, i. e., the objectionable language is contained in the licensing standard itself, and consequently would infect its operation in every case. In the absence of standards to control the Council's discretion, the Village is utterly incapable of insuring in any case brought before it that it will be able to "filter out those who will engage in protected speech from those who will engage in unprotected speech, restraining only the latter." *International Society For Krishna Consciousness*, 454 F.Supp. at 120.

---

**8.** This is particularly true in cases involving statutes which punish persons for speaking certain types of words and which carry the potential for inhibiting persons who cannot predict whether their speech would be protected or prohibited. See, e. g., *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). In such a case, the greater verifiability of commercial speech would indeed place the speaker in a better position to evaluate the lawfulness of his speech.

We doubt, however, that the profit motive would always provide a commercial speaker with the impetus to test an overbroad statute. Where only profits are at stake, a speaker is likely to engage in an economic calculus to determine whether the speech is "worth the candle." Where a person is moved to speak by ideological commitment, on the other hand, the impetus to speak one's mind, statute *vel non*, would seem to be much greater.

**9.** See our discussion of *Shuttlesworth* and *Staub, supra* at pp. 1072–1073.

We therefore find that Ordinance 77–13 is unconstitutionally overbroad.

Plaintiffs also claim that the ordinance violates due process, since its key language is so vague that "men of common intelligence must necessarily guess at its meaning." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). We agree.

> We begin with the following guidelines: As a matter of due process, "no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (cites) The general test of vagueness applies with particular force in review of laws dealing with speech. "Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser."

*Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976).

The ordinance is impermissibly vague in two respects. First, the coverage of the ordinance is unclear. It purports to regulate "real estate solicitation for listings," yet it fails to state what constitutes a "solicitation." Plaintiffs properly query whether the ordinance would prohibit a realtor from distributing business cards or from mailing advertisements for his business to homeowners in the Village. It cannot be argued that Section I of the ordinance defines the term. That section states that "[S]uch solicitation includes solicitation by telephone, by mail, in person or any other means." It is apparent that this sentence presumes that the definition of "solicitation" is known. Leaving this central term undefined may not only "trap the innocent by not providing fair warning," *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), but may also "chill" the realtors' exercise of their First Amendment rights:

Some realtors may find the application procedure so costly or so futile that, rather than becoming entangled in the "bureaucratic red tape," they would prefer to forego engaging in the protected speech entirely.

The sections of the ordinance regarding the licensing of solicitation requests contains an even more egregious example of vagueness. The statute allows the Council to deny an application if in its "opinion" solicitation would be "detrimental to the community." This language neither specifies what "those within its reach must do in order to comply," *Hynes*, 425 U.S. at 621, 96 S.Ct. at 1761, nor provides "explicit standards for those who apply" it. *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298. The language in this section is a far cry from the kind of precision which is required—and which we have come to expect—in statutes affecting First Amendment interests.

We therefore hold that Ordinance 77–13 is unconstitutionally vague.

## II. Ordinance 77–2

Plaintiffs make two objections to this ordinance: first, that it deprives certain persons of equal protection and second, that it is impermissibly vague.

On the equal protection point, plaintiffs argue that the ordinance arbitrarily distinguishes between residential property regarding which the owners have executed a listing agreement or issued a public notice of intent to sell on the one hand, and residential property which is available for rent or sale but has neither been listed nor publicly advertised, on the other. Without the benefit of evidence on the purpose of the ordinance and the possible bases for the distinction, we are not in a position to decide whether the ordinance deprives persons within its coverage of equal protection of the laws. Plaintiffs' motion for summary judgment on this point is therefore denied.

We are prepared, however, to rule on plaintiffs' due process challenge to Ordinance 77–2. Plaintiffs argue that the ordinance lacks the requisite precision with respect to its coverage and with respect to

what those within its reach must do to comply. Covered by the ordinance are "all owners, agents, Brokers or any individual or legal entity having ownership or control over any residential property which is offered for sale . . . ." Plaintiffs contend that this language does not sufficiently specify who would be considered a "broker," an "agent," or an "individual or legal entity having ownership or control."

■ We do not agree that the terms "broker" and "agent" are unclear. The statute is obviously aimed at procuring notice from the owner of the property or in the case of a "broker" or "agent," from a person hired by the owner to promote a sale. It is less clear, however, who falls into the category of persons "having ownership or control." Plaintiffs wonder whether the phrase describes apartment managers, mortgagees and trustees of a land trust. It might also be asked whether the language applies to tenants as well. Regardless of how these questions are answered, we do not see how plaintiffs have standing to raise them.

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the Court.

*Broadrick*, 413 U.S. at 610, 93 S.Ct. at 2914. These rules of standing in the First Amendment area have been relaxed only with respect to challenges to a statute's overbreadth. *Id.* at 611–612, 93 S.Ct. at 2915–2916.[10] For this reason, if there be any ambiguity in the terms "ownership and control," plaintiffs who are admittedly real es-

tate brokers and therefore clearly subject to the ordinance, are not the proper parties to raise the issue.

■ Plaintiffs do have standing, however, to challenge the vagueness of that section of Ordinance 77–2 which requires them to "notify the Village of Bellwood" five days after advertising a sale. Plaintiffs argue that this language does not sufficiently specify what those within the reach of the statute must do to comply with its terms. We agree. In *Hynes v. Mayor of Oradell, supra*, the Court struck down a virtually identical statute which provided that any person soliciting door-to-door for charitable or political causes "shall be required to notify the Police Department, in writing, for identification only." In holding the statute facially invalid, the Court observed that

> The citizen is informed that before soliciting he must "notify the Police Department, in writing, for identification only." But he is not told what must be set forth in the notice, or what the police will consider sufficient as "identification." . . . In this respect . . . this law "may trap the innocent by not providing fair warning."

*Hynes*, 425 U.S. at 621–622, 96 S.Ct. at 1761.

Ordinance 77–2 similarly fails to spell out what must be included in the notice to the Village. It does not state whether mere notification of the fact that a listing agreement or advertisement has been entered into is sufficient; or whether the notification must include details such as the address of the property, the name of the agent or broker engaged, the price asked or a copy of the advertisement or listing agreement.[11]

---

10. In *Hynes v. Mayor of Oradell*, the Supreme Court recognized that a vagueness challenge could only be made by a party whose First Amendment interests are compromised by the vague language. 425 U.S. at 621 n.5, 96 S.Ct. at 1761 n.5.

11. For an example of a notification statute which specifies in sufficient detail the kind of information required for compliance, see Ordinance 573 in *Hynes v. Mayor of Oradell*, 425

U.S. at 611–613 n.1, 96 S.Ct. at 1756–1757 n.1. It may be argued that the Bellwood statute should not be declared unconstitutional but merely given a strict construction. For example, the ordinance could be limited to require only the most minimal amount of information, i. e., the address of the property in question. However, this exercise of judicial "plastic surgery" would be subject to the same objections discussed in note 5, supra. Moreover, even if

The notification language poses yet another defect in Ordinance 77–2. In *Hynes* the Court also noted that the vague language requiring persons to "notify the Police Department" failed to "provide explicit standards for those who apply [the statute]." *Id.* at 622, 96 S.Ct. at 1761. Insofar as the ambiguities in Ordinance 77–2 give the Bellwood authorities the "effective power" to arbitrarily determine whether an attempt at notification complies with the ordinance, *Ibid.*, it suffers from the vice of overbreadth which we similarly condemned in Ordinance 77–13. While the notification language in Ordinance 77–2 may not pose imprecisions of the scope encountered in Ordinance 77–13, still, like that ordinance, Ordinance 77–2 seeks to punish persons for engaging in speech. As *Hynes* makes clear, legislation which implicates First Amendment interests must attain standards of precision higher than those reached by the Bellwood law.

We therefore hold that Ordinance 77–2 is unconstitutionally vague and overbroad.

In holding these two ordinances facially unconstitutional, this court is not unmindful of the difficulties posed to communities by "racial steering" in the real estate market. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 110, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979). It is nonetheless incumbent on a municipality to frame its response to this problem with due regard for the rights guaranteed by the Federal Constitution.

APPENDIX

Ordinance No. 77–13: An Ordinance Regulating Real Estate Solicitation In The Village of Bellwood, Cook County, Illinois.

*SECTION I.* Before any Real Estate Broker, Agent, or Salesman enters into any form of real estate solicitation for listings in the Village of Bellwood, such Broker, Agent or Salesperson shall complete and file with the Office of the Village Clerk a form setting forth a listing of the particular block or blocks which said person intends to solicit, setting forth the date on which each address will be solicited and indicating a realistic estimate of the actual intent of the solicitor of addresses to be contacted. Such solicitation shall include solicitation by telephone, by mail, in person or any other means. Forms may be obtained from the Village Clerk's Office.

*SECTION II.* This form shall be completed and filed with the Village Clerk's Office no less than twenty (20) days nor more than thirty (30) days prior to the date upon which the solicitation will take place.

*SECTION III.* The Citizens' Advisory Council of the Community Relations Department shall review said forms prior to the requested solicitation date and, if in the opinion of the Council said solicitation shall be deemed to be detrimental to the welfare of the community or to be in violation of anti-panic-peddling provision of Chapter 37, The Bellwood Village Code, The Fair Housing Ordinance, either in intent or effect, shall deny the request for solicitation.

*SECTION IV.* The Council shall review said forms only at its regular meetings.

*SECTION V.* If the request for solicitation is approved by the Commission, the Broker, Agent, or Salesperson making the request shall mail to each home to be solicited in the said area of solicitation a copy of the listing filed with the Village Clerk, together with a notice or request to the homeowner of permission to call upon the homeowner, at least fifteen (15) days before calling upon said home.

*SECTION VI.* To solicit a real estate listing from any homeowner or occupant of a home who has not granted permission in writing to the solicitor to visit his home for the purpose of discussing the sale or leasing of the premises shall be a violation of this section.

we were to limit the ordinance by deeming "good faith" attempts at compliance to be sufficient, we would have succeeded in doing nothing more than substituting one vague term for another.

*SECTION VII.* No person shall file for said solicitation purposes more than once in a six (6) month period.

*SECTION VIII.* Any Real Estate Broker, Agent or Salesman violating the provisions of this Ordinance shall be fined not less than $50.00 nor more than $500.00 for each day. Every violation shall be deemed a separate violation.

*SECTION IX.* This Ordinance shall be in full force and effect upon its adoption and publication as provided by law; and at that time all ordinances and parts of ordinances in conflict with this ordinance are hereby repealed.

Ordinance No. 77–2: An Ordinance Requiring Notification of Intent to Sell or Rent Residential Property.

*SECTION I.* That all owners, agents, Brokers or any individual or legal entity having ownership or control of any residential property which is offered for sale or rental within the Village of Bellwood, must notify the Village of Bellwood, Department of Community Relations & Building Commissioner within five (5) days after the first real estate listing agreement is entered into, and or public notification of such intent to sell or rent is made, whichever shall occur first.

*SECTION II.* That any owner, agent, Broker, individual or any legal entity violating any provision of this article shall be fined not less than Five ($5.00) Dollars nor more than Five Hundred ($500.00) Dollars for each offense. A separate offense shall be deemed committed on each day during or on which a violation occurs or continues.

This ordinance shall be in full force and effect from and after its passage, approved and publication as required by law.