FILED
United States Court of Appeals
Tenth Circuit

December 4, 2023

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DAVID MICHAEL BISHOP; SLIM
VENTURES, LLC,

      Petitioners - Appellants,

v.

UNITED STATES OF AMERICA;
INTERNAL REVENUE SERVICE;
TIMOTHY BAUER, Internal Revenue
Agent (ID #0324589), in his official
capacity,

      Respondents - Appellees.

Nos. 23-4020, 23-4021, 23-4022,
23-4026 & 23-4027
(D.C. Nos. 2:22-CV-00340-DBB,
2:22-CV-00344-DBB,
2:22-CV-00351-DBB,
2:22-CV-00345-DBB &
2:22-CV-00352-DBB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **McHUGH**, Circuit Judges.
_____

In 2021, the Internal Revenue Service (IRS) began investigating petitioners

David Michael Bishop and Slim Ventures, LLC, for commercially promoting

monetized installment sales as a way of delaying the reporting of capital gains on the

sale of assets.  As part of that investigation, the IRS issued summonses to four banks

that it believed might have records associated with petitioners' activities.  Petitioners

responded by filing petitions to quash the summonses.  After allowing the parties to

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

brief the matter, the district court denied the petitions to quash and entered separate judgments in favor of the government in each case.  Petitioners now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgments of the district court.

I

*Factual background*

*a)  Monetized installment sales*

The Internal Revenue Code (Code) defines an "installment sale" as "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs."  26 U.S.C. § 453(b)(1).  The Code permits the seller in a typical installment sale to report capital gains either in the tax year that title to the property is transferred from the seller to the purchaser or in the tax year that the purchaser actually pays for the property, assuming that those years are different.  *Id.* § 453(a), (c), (d).

A monetized installment sale (MIS) attempts to delay the reporting of capital gains for many years.  In an MIS, "an intermediary purchases appreciated property from a seller in exchange for an installment note, which typically provides for payments of interest only, with principal being paid at the end of the term." *Fed. Tax Coordinator*, ¶ T-10164.10 (2d. Nov. 2023).  "In these arrangements, the seller gets the lion's share of the proceeds but improperly delays the gain recognition on the appreciated property until the final payment on the installment note, often slated for many years later."  *Id*.

In 2021, the IRS published a Chief Counsel Advisory warning that an MIS, for numerous reasons, has no legal effect. Aplt. App. at 50. "[A]n arrangement to swap equal sums of cash in 30 years, solely to avoid taxation, is a quintessential farce" according to the IRS. *Id.* "Since issuing that advisory, the IRS has twice included MIS on its annual list of 'dirty dozen' scams to watch out for." *Id.*; *see Dirty Dozen: Watch Out For Schemes Aimed At High-Income Filers; Charitable Remainder Annuity Trusts, Monetized Installment Sales Carry Risk*, IRS News Release, IR-2023-65, 2023 WL 2727299 (Mar. 31, 2023).

b) *Bishop*

Bishop received a law degree from George Mason University in 1996, and subsequently worked as a financial planner. In November 2003, the IRS filed a civil action against Bishop in the United States District Court for the District of Utah seeking to enjoin him from promoting the "Employee Leasing and Foreign Deferred Compensation" program. Aple. Br. at 6–7; *see United States v. Bishop*, 2:03-cv-01017-BSJ (D. Utah). At the time it filed the lawsuit, the IRS had recently published guidance warning of an "abusive arrangement" whereby taxpayers, typically those who were self-employed, sought to defer or avoid taxes by forming a foreign corporation which then "leased" their labor back to their business in the United States. Aple. Br. at 7 (citing IRS Notice 2003–22, 2003–18 I.R.B. 851, 2003–1 C.B. 851, 2003 WL 1786830). In December 2003, the district court overseeing the matter entered a permanent injunction barring Bishop from, among other things,

3

promoting any tax plan that Bishop knew or had reason to know was false or

fraudulent as to any material matter.[1]  Aplt. App. at 51.

c)  *Slim Ventures*

In 2021, the IRS's Lead Development Center (LDC)[2] began identifying

promoters of MIS.  One of those promoters was an entity called Slim Ventures, LLC

(Slim Ventures).  "Promotional materials on Slim Ventures' website promised that

'[a]n owner of highly appreciated assets c[ould] sell them and defer 100% of the

capital gains tax for up to 30 years while receiving up to 95% of the value in cash.'"

*Id*.  The website described how MIS worked and stated that the first step was for an

interested seller of any capital asset to find a buyer and then contact Slim Ventures.

The website stated that Slim Ventures would act as "an intermediate purchaser from

---

[1] In the final judgment of permanent injunction entered in the case, the district court found that Bishop "ha[d] not admitted the [government's] allegations that [he had] engaged in conduct that [wa]s subject to penalty under" the IRC, but had nevertheless "consented to the entry of judgment for injunctive relief . . . to prevent [him] from (1) engaging in conduct subject to penalty under [the IRC]; and (2) organizing, promoting, and selling [an] 'Employee Leasing and Foreign Deferred Compensation' program."  Aple. Br., Addendum at 2.  The judgment also, more specifically, prohibited Bishop from "[m]aking false statements that participation in the 'Employee Leasing and Foreign Deferred Compensation' program will eliminate taxes on income in excess of consumption levels or will eliminate or defer capital gains taxes," and from "[e]ncouraging, instructing, advising and assisting others to violate the tax laws, including to evade the payment of taxes legally due, by participating in the 'Employee Leasing and Foreign Deferred Compensation' program."  *Id*.

[2] According to the record, the LDC "receives, identifies, and develops leads on individuals and entities that promote or aid in the promotion of abusive tax schemes." Aplt. App. at 65.  The LDC is part of the IRS's Office of Promoter Investigations. Aple. Br. at 12.

the seller" and "re-sell[] the asset to the final buyer." *Id*.  But, according to the website, "[t]he deed or other title instrument . . . 'w[ould] pass directly (in a 'directed' transfer) from Slim Ventures LLC's seller to Slim [V]entures LLC's buyer, without going through Slim Ventures.'" *Id*.  Thereafter, Slim Ventures would "pay[] the seller with 'an unsecured installment contract' for about 95% of the sale proceeds." *Id*.  "The entire principal on this installment contract [would be] due in 30 years." *Id*.  As part of the transaction, "a 'third-party lender' [would] give[] the seller a cash loan equal to the principal." *Id*.  "The interest that the seller owe[d] the third-party lender [would] equal[] the interest owed to the seller on Slim Ventures['] installment contract." *Id*. at 51–52.  This meant that the seller would "delay paying a capital gains tax for 30 years, while [receiving] 95% of the sale proceeds up front." *Id*. at 52.

   d) *The IRS's investigation of Slim Ventures*

   The IRS determined that Slim Ventures was established by Bishop, and that Bishop served as its managing director.  On September 30, 2021, IRS Revenue Agent Tim Bauer[3] interviewed Bishop regarding his promotion of MIS.  Bauer explained at the outset of the interview that the IRS was investigating whether Bishop could be liable for tax penalties under 26 U.S.C. § 6700 resulting from the MIS transactions.  Bishop told Bauer that he learned about MIS from a financial advisor named Stanley

---

   [3] This is a pseudonym employed by the United States in this case for privacy and safety reasons.

Crow, who had a website promoting MIS.[4]  According to Bishop, he studied Crow's website for six months before deciding to market MIS himself.  Bishop stated that he used the information from Crow's website to write Slim Ventures' promotional materials.

Bishop characterized MIS as his first "pay day" and he told Bauer that, during the previous three years, he had averaged three to four sellers per month.  Aplt. App. at 52.  Bishop said that he used a bank named Summit Crest Financial LLC (Summit Crest) as the third-party lender for all of the MIS.  Bishop also told Bauer that a family trust, of which his daughters were beneficiaries, owned Slim Ventures and that he simply managed Slim Ventures.  Bauer suspected, however, that Bishop was the de facto owner of Slim Ventures and was using the family trust to hide that fact.

Between June 2021 and February 2022, the IRS formally requested from Bishop documents related to his promotion of MIS or similar tax plans.  Bishop responded with some information but, according to the IRS, "left myriad questions unanswered."  *Id*. at 53.  For example, Bishop refused to respond to the IRS's requests for his accounting records, bank statements, and client list.

Bauer searched Slim Ventures on the IRS's Information Returns Processing (IRP) system.  "IRP stores data on payments to third parties."  *Id*.  In the IRP, Bauer found information indicating that Wells Fargo Bank had paid Slim Ventures $11,227

---

[4] According to the IRS, Crow "was himself under investigation for promoting abusive tax schemes."  Aple. Br. at 12 (citing *S. Crow Collateral Corp. v. United States*, 782 F. App'x 597, 598 (9th Cir. 2019)).

in interest in 2020. According to the IRS, "[s]uch a large amount of ordinary bank interest indicates that Slim Ventures likely held a substantial sum of money with Wells Fargo in 2020." *Id.* "Further research on internal IRS systems indicated that Key Bank and Zions Bank [(Zions)] m[ight] likewise have information relevant to Bishop's promotion of MIS." *Id.* at 53–54.

### e) The IRS's summonses

Based upon this information, Bauer prepared IRS summonses to Wells Fargo, Key Bank, Zions, and Summit Crest. Bauer believed that records from these entities could "help determine whether to assess § 6700 penalties against Bishop for promoting MIS" and would also "be relevant to a contempt inquiry against Bishop for violating the Court's injunction not to promote fraudulent tax schemes." *Id.* at 54.

On May 4, 2022, the IRS issued eight summonses to Zions, Wells Fargo, Key Bank, and Summit Crest seeking records concerning any bank accounts of Bishop or Slim Ventures for the period from January 1, 2018 through the "date of compliance."[5] Aplt. App. at 43; Supp. App. at 50. The summonses issued to Summit Crest sought records relating to monetized installment sales in which either Bishop or Slim Ventures was identified as a seller or borrower for the period from January 1, 2018, through the "date of compliance." Supp. App. at 72. After issuing the summonses,

---

[5] Each entity received two summonses: one relating to Bishop and one relating to Slim Ventures.

the IRS mailed notices of the summonses to Bishop and Slim Ventures as required by

26 U.S.C. § 7609(a)(1).

On May 6, 2022, Key Bank notified Bauer that it had no documents responsive

to the summons issued to it.  Zions did the same on May 31, 2022.

II

*Procedural history*

On May 20 and 23, 2022, Bishop and Slim Ventures each filed separate

petitions to quash the summonses in the United States District Court for the District

of Utah.[6]  Aplt. App. at 1; Supp. App. at 29, 51, 73, 95.  The government moved to

consolidate all of the cases.  Aplt. App. at 45–62.  The government also moved to

deny as moot the summonses issued to Zions and Key Bank and to compel

compliance with the summonses issued to Wells Fargo and Summit Crest.

On December 13, 2022, the district court notified the parties that, in lieu of

consolidation, it intended to sua sponte reassign all of the cases to a single district

court judge pursuant to its local civil rules of practice.  Aple. App. at 6.  Although the

district court afforded the parties seven days to object to the proposed reassignment,

neither party objected.  Consequently, on December 22, 2022, all of the cases were

reassigned to the same district court judge.

---

[6] The eight petitions were assigned the following district court case numbers:
2:22-cv-00340-DBB (Bishop/Zions); 2:22-cv-00341-DBB (Slim Ventures/Key
Bank); 2:22-cv-00344-DBB (Bishop/Wells Fargo); 2:22-cv-00345-DBB (Slim
Ventures/Summit Crest); 2:22-cv-00347-DBB (Bishop/Key Bank);
2:22-cv-00348-DBB (Slim Ventures/Zion); 2:22-cv-00351-DBB (Slim Ventures/Well
Fargo); 2:22-cv-00352-DBB (Bishop/Summit Crest).

On January 9, 2023, the district court granted the government's motion, denied the petitions to quash, ordered Wells Fargo and Summit Crest to respond to the respective summonses, and entered separate judgments in favor of the government in all eight cases. In doing so, the district court concluded, as an initial matter, that the petitions to quash the summonses issued to Key Bank and Zions were moot because both of those "banks informed the IRS that they had no information responsive to the summonses" and the IRS in turn "state[d] that it w[ould] not enforce the summonses." Aplt. App. at 199–200.

As for the remaining summonses, the district court concluded that the IRS made a prima facie case that it properly issued the summonses to Summit Crest and Wells Fargo because the IRS demonstrated that it had not referred the case for criminal prosecution and had issued the summonses in good faith. The district court in turn concluded that Bishop and Slim Ventures failed to meet their burden of refuting the IRS's prima facie showing of good faith. In particular, the district court rejected the argument by Bishop and Slim Ventures "that the IRS [was required to] prove the illegality of MIS transactions before beginning its investigation." *Id*. at 207. The district court also rejected as "pure conjecture" what it characterized as "an expansive First Amendment argument" by Bishop and Slim Ventures "to assert an improper purpose for the summonses." *Id*. at 208–09. The district court denied the requests by Bishop and Slim Ventures for an evidentiary hearing, concluding that they failed to point to any evidence of bad faith on the part of Bauer, as well as their

requests for in camera review of the documents sought by the summonses. Finally, the district court denied as moot the government's motion to consolidate the cases.

Judgment was entered in the cases on January 9, 2023. Bishop and Slim Ventures filed notices of appeal on February 22, 2023.[7]

III

Petitioners argue on appeal that the district court erred in two respects: (1) in determining there was no violation of First Amendment rights and by embracing a view of IRS power that eviscerates the First Amendment; and (2) by wholesale ignoring controlling precedents, statutes, and facts demonstrating various legal grounds and improper purposes and in turn short-circuiting litigation processes such as an evidentiary hearing.

---

[7] Appeal No. 23-4020 arose out of District Court Case No. 2:22-cv-00340-DBB. Appeal No. 23-4021 arose out of District Court Case No. 2:22-cv-00344-DBB. Appeal No. 23-4022 arose out of District Court Case No. 2:22-cv-00351-DBB. Appeal No. 23-4023 arose out of District Court Case No. 2:22-cv-00341-DBB. Appeal No. 23-4024 arose out of District Court Case No. 2:22-cv-00348-DBB. Appeal No. 23-4025 arose out of District Court Case No. 2:22-cv-00347-DBB. Appeal No. 23-4026 arose out of District Court Case No. 2:22-cv-00345-DBB. Appeal No. 23-4027 arose out of District Court Case No. 2:22-cv-00352-DBB.

Four of these appeals—No. 23-4020, 23-4023, 23-4024, and 23-4025—pertained to the summonses issued to Key Bank and Zions. As noted, the district court agreed with the government that the petitions to quash all of these summonses were moot because Key Bank and Zions responded to the summonses and indicated they had no records responsive thereto. Petitioners dismissed Appeal Nos. 23-4023, 23-4024, and 23-4025 after they were filed. For some unexplained reason, however, petitioners failed to dismiss No. 23-4020, which sought to quash the summonses issued to Zions seeking records pertaining to Bishop. Nevertheless, petitioners do not challenge the district court's conclusion that those summonses were moot. We therefore summarily affirm the judgment of the district court in that case.

A

Before addressing these two issues on the merits, we begin by briefly discussing the IRS's authority to issue summonses, the manner by which the IRS can seek to enforce its summonses, and the manner by which taxpayers can challenge IRS summonses.

"Congress has 'authorized and required' the IRS 'to make the inquiries, determinations, and assessments of all taxes' the Internal Revenue Code [(IRC)] imposes." *United States v. Clarke*, 573 U.S. 248, 249–50 (2014) (quoting 26 U.S.C. § 6201(a)). Congress has, in turn, "granted the Service broad latitude to issue summonses '[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . , or collecting any such liability.'" *Id.* (quoting 26 U.S.C. § 7602(a)(1)). This includes the "authority to issue summonses to the subject taxpayer and to third parties who may have relevant information." *Standing Akimbo, LLC v. U.S. through Internal Revenue Serv.*, 955 F.3d 1146, 1154 (10th Cir. 2020).

A taxpayer may challenge an IRS summons by filing an action in federal district court to quash the summons. The IRS, for its part, may file an enforcement action in federal district court if a taxpayer does not comply with a summons. *Clarke*, 573 U.S. at 250.

In either type of proceeding, the IRS must, "[a]s a threshold matter, . . . show that it has not made a referral of the taxpayer's case to the Department of Justice . . . for criminal prosecution." *Standing Akimbo*, 955 F.3d at 1154 (internal quotation

11

marks omitted). After that, a reviewing court is limited to asking "only whether the IRS issued [the] summons in good faith, and must eschew any broader role of overseeing the IRS's determinations to investigate." *Clarke*, 573 U.S. at 254 (internal quotation marks and alterations omitted).

For the IRS to "demonstrate good faith in issuing the summons[es]," the IRS simply must establish "what have become known as the *Powell* factors: 'that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [IRS's] possession, and that the administrative steps required by the [Internal Revenue] Code have been followed.'" *Id*. (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)). "To make that showing, the IRS usually files an affidavit from the responsible investigating agent." *Id*.

"The taxpayer, however, has an opportunity to challenge that affidavit, and to urge the court to quash the summons 'on any appropriate ground . . . .'" *Id*. (citing *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)). "Appropriate grounds" are limited to circumstances that amount to an abuse of the court's process. *Powell*, 379 U.S. at 58; *see Reisman*, 375 U.S. at 449. "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. "The burden of showing an abuse of the court's process is on the taxpayer, and it is not met," for example, "by a mere showing . . . that the statute of limitations for ordinary

deficiencies has run or that the records in question have already been once examined." *Id*.

B

We now turn to the two issues raised by petitioners. For the reasons outlined below, we conclude that both issues lack merit.

*1) First Amendment challenge and related issues*

In their first issue on appeal, petitioners assert that the district court erred by determining that there was no violation of their First Amendment rights, and by embracing a view of IRS power that eviscerates the First Amendment.

Petitioners argue in support that the summonses at issue were issued for an improper purpose, i.e., because "[t]he IRS and the Biden Administration strongly disliked Petitioners' views about the legality of MIS and the depiction of the IRS and Administration as allegedly inconsistent and preferential in affording MIS to elite, wealthy, well-connected well-lobbied, influential taxpayers, compared to others of lesser wealth and influence." Aplt. Br. at 32–33. In other words, petitioners assert that they were "targeted" based "solely on the (illegal) criteria of [their] speech content on the internet; the IRS did not utilize speech-neutral means or criteria." *Id*. at 33 (emphasis omitted).

Relatedly, petitioners argue that

> [i]t is undisputed that A) neither Petitioner has any existing delinquent tax balance . . . ; B) neither Bishop personally nor Slim Ventures has ever been found to have actually done anything unlawful; C) the IRS has no evidence either Petitioner has ever actually engaged in or induced any 'improper' financial or tax transaction at any time . . . ;

13

D) even if, arguendo, the IRS could show Petitioners had actually committed any MIS which the IRS now disfavors, the IRS cannot show MIS is actually illegal at all, and the IRS admitted in its own filings 'no court has yet considered whether MIS are fraudulent', and scholarly tax articles 'tout their supposed efficacy'; E) the IRS has allowed MIS for various other (well-resourced) taxpayers; F) the IRS has already utterly failed to garner even a single relevant document in connection with 4 of 8 summons used for its fishing expedition; and G) Summit, one of the targets with the two remaining summonses, has already told the District Court it has no relevant records to produce.

*Id*. at 34–36 (emphasis and footnotes omitted).

In order to address petitioners' arguments, it is necessary to place them into the proper procedural context. As we have noted, petitioners initiated these proceedings by moving to quash the summonses that were issued by the IRS. The government opposed the petitioners' motions to quash by moving to enforce the summonses. In support, the government submitted a declaration from IRS Revenue Agent Bauer that stated that "[n]o 'Justice Department referral' has been in effect with respect to Bishop since the summonses were served," and in turn satisfied all of the *Powell* factors by stating that: (1) he was investigating the petitioners' activities to determine whether Bishop was subject to penalties under 26 U.S.C. § 6700 for promoting abusive tax schemes and whether he had violated the permanent injunction that was entered against him in *United States v. Bishop*, 2:03-cv-001017 (D. Utah); (2) the records sought by the summonses were relevant to his investigation of petitioners; (3) the information sought in the summonses was not already within the IRS's possession because Bishop had previously refused to provide any documents to Bauer in response to his request for his accounting records; and (4) he had informed

14

Bishop about the investigation and had also sent IRS Forms 2039 to Bishop and Slim Ventures, via certified mail, notifying them of the summonses served on the four banks. Aplt. App. at 68. The district court concluded, based upon Bauer's declaration, that the government made a prima facie case that the IRS properly issued the summonses to Summit Crest and Wells Fargo.

The district court in turn concluded that petitioners failed to meet their burden of refuting the government's prima facie showing of good faith. In reaching this conclusion, the district court noted, in relevant part, that petitioners were claiming "that the IRS began its investigation to chill their expressive view that MIS transactions are legal." Aplt. App. at 206. The district court further noted that petitioners asserted in support of this claim "that customers and business partners [had been] frightened away by the IRS investigation." *Id*. at 206–07. The district court concluded, however, that "evidence of an alleged adverse effect from an investigation is not evidence of improper intent" and that petitioners' "claim that unnamed persons ha[d] been scared off [wa]s both conclusory and not material." *Id*. at 207. The district court also noted and rejected petitioners' argument "that the IRS ha[d] failed to connect the dots 'between any purportedly forbidden scheme(s) and any specific language in any statute or case precedent.'" *Id*. Specifically, the district court concluded that petitioners "offer[ed] [no] support for the proposition that the IRS must prove the illegality of MIS transactions before beginning its investigation" and that, in fact, "courts have rejected the notion that the IRS must show probable cause to open investigations." *Id*. at 207–08. "In short," the district court concluded

15

that "Petitioners' arguments amount[ed] to preemptive defenses as to their ultimate liability and d[id] not rebut the government's showing of good faith." *Id*. at 208.

We conclude, petitioners' appellate arguments notwithstanding, that the record on appeal firmly supports the district court's conclusions. To begin with, there is no evidence that supports petitioners' claim that the IRS's investigation was motivated by an intent to chill their First Amendment rights or to "arbitrarily target Bishop for his scholarly legal musings." Aplt. Br. at 67. To be sure, the record indicates that the IRS first became aware of Slim Ventures because of information contained on Slim Ventures' web site promoting MIS. But, importantly, it was not the petitioners' mere expression of thought that prompted the IRS to issue the challenged summonses. Rather, the record indicates that Bauer first interviewed Bishop and learned from him that he and Slim Ventures had been actively promoting MIS for profit for a period of approximately three years, averaging three to four transactions per month. Bauer in turn learned, after researching Slim Ventures on the IRS's IRP system, that Wells Fargo had paid Slim Ventures a substantial amount of interest in 2020, suggesting that Slim Ventures held a substantial amount of money with Wells Fargo during 2020. All of that information, combined with the IRS's concern that some MIS were being misused to illegally avoid taxes, is what prompted the investigation and, in turn, the issuance of the summonses. There is no evidence in the record suggesting that Bauer's motivation was to suppress petitioners' speech. To the contrary, the evidence in the record indicates only that Bauer acted to obtain

16

more information in order to determine whether petitioners were actively engaging in a scheme to assist individuals and businesses to illegally avoid paying federal taxes.

Although petitioners assert that they have no delinquent tax balances, that is irrelevant to the question of whether the investigation was implemented in good faith. Likewise, the fact that, as petitioners argue, some MIS are considered permissible under the IRC does not mean that all variations of such sales are permissible. And, indeed, the IRS submitted its own evidence suggesting that some MIS are improper under the IRC. In any event, it is not within the scope of our authority, given the limited nature of these proceedings, to determine at this point the legality of any MIS transactions that Bishop and Slim Ventures may have been involved in or may be promoting.

Petitioners complain that the district court did not "allow a conference or hearing on any topic or wait to give Petitioners any opportunity to finish preparing and submitting a motion for leave to file a surreply or supplemental brief or anything else," even though "the case involved eight petitions . . . , two petitioners, four different targets of the subpoenas situated differently, and a complicated collection of issues arcane enough that [the district court] allocated [itself] about 33 pages to discuss the situation in [its] own written rulings." Aplt. Br. at 39–40. Notably, however, petitioners do not explain what they would have said in a surreply or supplemental brief, nor do they discuss what evidence, if any, they would have presented at "a conference or hearing" on their motion to quash. *Id.* at 39. Thus,

they have failed to establish that the district court erred in denying their motion to quash based upon the written record that was developed by the parties.

Petitioners also assert that they "asked [the district court] to analyze and rule upon and [sic] entire set of statutes and cases [they] had cited from the onset (especially post-*Powell* legal authorities enhancing and expanding taxpayer protections)." *Id*. at 43. They in turn assert that the district court "committed legal error and an abuse of discretion by refusing to even mention (let alone analyze or apply) the statutes and cases at any time throughout the case." *Id*. at 44 (emphasis omitted). Notably, petitioners essentially repeat these arguments in their second issue on appeal. As we shall discuss below, none of the statutes and cases cited by petitioners call into question the district court's decision.

Petitioners make a number of other arguments that have no basis in fact. For example, petitioners assert that the IRS's position is "that [its] power has no limiting principle whatsoever and the First Amendment, *Powell* test, taxpayer protections statutes, federal courts, *Clarke* evidentiary hearings, and other protective features of our legal system are *de facto* vestigial and illusory."[8] Aplt. Br. at 63–64. Nothing in the record supports this assertion and we summarily reject it, along with the other, similar arguments made by petitioners.

---

[8] Petitioners similarly assert that "[t]he IRS urges it is a law unto itself, with no limitation other than its own whim" and that "[t]he IRS says it can selectively and deliberately target anyone for expensive investigations based solely on disfavored speech." Aplt. Br. at 64. Nothing in the record supports these assertions.

18

Petitioners also assert that the IRS acted in this case "without any indication either Petitioner had actually committed any tax violation." *Id*. at 65. That is incorrect. As we have noted, Bauer's interview with Bishop led him to believe that Bishop and Slim Ventures might be engaged in improper activity involving MIS. In any event, the very purpose of an IRS investigation is to determine whether a tax violation has occurred. Therefore, to suggest that the IRS must have proof that a tax violation occurred *before* it can conduct an investigation is simply wrong.

Lastly, petitioners assert that "[t]he IRS invented a precept of MIS tax law which hasn't been declared by any statute or court decision, and the IRS hasn't consistently followed." *Id*. Whether there is any validity to this assertion is frankly irrelevant to this limited enforcement action. As the district court essentially noted, petitioners can assert these arguments if and when the IRS charges them with a tax violation related to their promotion of MIS.

In sum, we conclude there is no merit to petitioners' assertion that the IRS's investigation, and in turn the challenged summonses, were motivated by an intent to infringe upon petitioners' First Amendment rights.

*2) Did the district court procedurally err and/or ignore controlling precedents and statutes?*

In their second issue on appeal, petitioners argue that the district court "erred by wholesale ignoring controlling precedents, statutes, and facts demonstrating various legal grounds and improper purposes" and also "by short-circuiting litigation processes such as the *Clarke* evidentiary hearing requirement." Aplt. Br. at 67

19

(capitalization omitted).  Petitioners also assert a number of related sub-issues, each of which will be addressed below.

### a)  Post-*Powell* taxpayer protection statutes and case law

Petitioners argue that "[t]he IRS and the District Court refuse[d] to even mention post-*Powell* statutes enacted to protect taxpayers, such as 26 U.S.C. § 7605(b)," which states in relevant part that "[n]o taxpayer shall be subjected to unnecessary examination or investigations," "26 U.S.C. § 7602(e)," which petitioners assert "curtail[s] IRS use of 'financial status or economic reality examination techniques'" "and various statutes and case law expressly allowing MIS use."  Aplt. Br. at 68–69 (emphasis omitted).  Petitioners further argue that "[n]either the IRS nor the District Court offered a cogent reconciling theory about why statutory plain language meaning could be ignored, let alone reconciling Congressional intent, what practical role such statutes might have inside or outside the *Powell* test, or how such statutes can be accorded any interpretation to afford meaningful protection for taxpayers if the IRS position prevails."  *Id*. at 69.

Notably, petitioners fail to cite to a single case holding that the standard of review outlined in *Powell* for challenges to IRS summonses has been altered by any of the statutes that they now cite.  And for good reason.  Nothing in the specific statutes cited by petitioners seriously calls into question the standards outlined in *Powell*.  For example, 26 U.S.C. § 7605(b), which is cited by petitioners, states that "[n]o taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable

20

year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary." Although petitioners describe this as a "post-*Powell* statute," this statutory language was in existence at the time that *Powell* was issued. *See United States v. Carey*, 218 F. Supp. 298, 299 (D. Del. 1963) (discussing the language of § 7605(b)).

Petitioners also point to 26 U.S.C. § 7602(e) as a "post-*Powell*" statute that could impact the case. Section 7602(e) states that "[t]he Secretary shall not use financial status or economic reality examination techniques to determine the existence of unreported income of any taxpayer unless the Secretary has a reasonable indication that there is a likelihood of such unreported income." 26 U.S.C. § 7602(e). The phrase "financial status or economic reality examination techniques" is not defined in the statute, but it appears to refer to an "indirect method" of proof in a tax case that relies on reconstructing a defendant's finances by way of circumstantial evidence such as net worth analysis, bank deposits, and cash expenditures in excess of reported income. *See Chapin v. Internal Revenue Agent*, 2016 WL 383135 (D. Idaho Jan. 8, 2016); *United States v. Hart*, 70 F.3d 854, 860 n.8 (6th Cir. 1995) (discussing the indirect method of proof). Petitioners have made no attempt to explain the relevance of this statute to their case, and it is not readily apparent how the statute is relevant to a challenge to the validity of the summonses at issue. Most importantly, nothing in the statute calls into the question the standards outlined in *Powell* that apply in an action to quash or enforce an IRS summons.

Finally, petitioners refer to "various statutes and case law expressly allowing MIS use." Aplt. Br. at 68–69 (emphasis omitted). Notably, petitioners do not directly cite to any of these purported statutes or cases, and instead cite to three locations in the record that supposedly contain references to these statutes and case law. A review of the cited record pages, however, fails to produce any such "statutes and case law."

We therefore conclude that the district court did not ignore any relevant post-*Powell* statutes or cases.

### b) Non-*Powell* sources for quashing a summons

Petitioners next argue that the district court "and the IRS have repeatedly pretended that *Powell* is the only avenue or test for quashing IRS summonses, when in reality the *Powell* factor test per se is only *one non-exclusive avenue* for quashing a summons which doesn't supplant other independent legal avenues or doctrines for doing so." *Id*. at 69 (emphasis in original). Petitioners suggest that other such avenues include "the First Amendment, various taxpayer protection statutes, and an entire line of post-*Powell* precedents with other additional parallel, non-supplanted summons tests involving ambiguity, fishing expeditions, disproportionality, relevance, etc." *Id*. at 70.

The First Amendment cases cited by petitioners, however, are irrelevant for two reasons. First, as we have already concluded, petitioners have failed to establish that the IRS's investigation of them was based solely on protected speech or was intended to infringe on their First Amendment rights. Second, none of the cases cited

22

by petitioners deal with IRS summonses, and thus are all clearly distinguishable. *See id*. at 25 n.14 (citing various First Amendment cases).

As for the so-called "taxpayer protection statutes," petitioners point only to 26 U.S.C. §§ 7602(e) and 7605(b). As discussed above, both of these statutes are irrelevant to the question of whether the summonses in this case should be enforced.

According to petitioners, the "entire line of post-*Powell* precedents" that they refer to in their opening brief holds that (a) "[t]he IRS must make a showing of relevance tying purposes, theories and requested records in a valid, connect-the-dot fashion for the burden to shift to the Petitioner and for a Summons to be valid," (b) "[t]he IRS isn't entitled to '*carte blanche* discovery,'" (c) "a summons will not be enforced if 'overbroad and disproportionate' to the investigation, or a mere 'fishing expedition' through a taxpayer's records that 'might' uncover something about someone." Aplt. Br. at 27–28 n.19. Even assuming this to be true, it is clear from the record that the IRS has established that the challenged summonses are relevant, not overly broad, and not intended as a "fishing expedition" into petitioners' records.

That leaves only petitioners' reference to "other additional parallel, non-supplanted summons tests involving ambiguity, fishing expeditions, disproportionality, relevance, etc." *Id*. at 70. Notably, petitioners do not actually cite to or otherwise describe any of these purported "tests."

Thus, petitioners have failed to establish that the district court ignored relevant precedent in denying their motion to quash the summonses.

*c) Did the district court ignore controlling case law?*

Petitioners next assert that the district court "ignored entire lines of controlling cases . . . requiring the summonses be quashed under the First Amendment and also under the "impermissible purpose" factor for the core *Powell/Clarke* test." *Id*. at 71 (capitalization omitted).

In support, petitioners first assert "that the District Court wholly ignored *Bantam Books, Inc. v. Sullivan*, [372 U.S. 58 (1963)] and numerous other of Petitioners' cases ruling Government investigations and summons cannot be used to chill or retaliate against disfavored First Amendment speech." *Id*. at 71–72. Most of the cases cited by petitioners, however, have nothing to do with the IRS or summonses, and thus they have little, if any, relevance to this case.[9] Petitioners do cite to a 1985 Tenth Circuit case, *United States v. Church of World Peace*, 775 F.2d 265 (10th Cir. 1985), in which this court set aside a district court's order enforcing an IRS summons for "all the books, records and accounts of the Church of World Peace," including "a list of members and names of persons for whom marriage ceremonies were performed." *Id*. at 265. That case is factually distinguishable, however, because this court was concerned in that case about the IRS's request for a membership list. No such request is at issue in the case at hand.

---

[9] In *Bantam Books*, for example, the Supreme Court held that the acts and practices of the Rhode Island Commission to Encourage Morality in Youth, in declaring certain publications objectionable for sale, distribution or display to youths under 18 years of age, were unconstitutional. 372 U.S. at 71. The case did not involve either the IRS or any type of summons.

Petitioners also cite to an unpublished decision from the United States District Court for the Southern District of Ohio, *Lightborne Publ'g, Inc. v. Citizens for Cmty. Values*, No. 1:08-CV-00464, 2009 WL 778241 (S.D. Ohio March 20, 2009), that they suggest involved the IRS's "use[] [of] threats and investigation to suppress speech." Aplt. Br. at 72 n.112. The IRS, however, had no involvement in that case. Thus, it is inapposite.

Ultimately, petitioners have, as discussed above, failed to provide any evidence that would have allowed the district court to reasonably find that either the IRS investigation or the challenged summonses were intended to chill petitioners' First Amendment rights or to retaliate against petitioners for "disfavored First Amendment speech." To the contrary, the record establishes that the issuance of the summonses was prompted, in large part, by Bishop's own admission that Slim Ventures had engaged in numerous, and what appeared to Bauer to be questionable, MIS transactions for profit over a period of years.

### d) *Petitioners' concluding arguments*

Finally, petitioners argue that "[t]he district court erroneously ignored entire lines of cases . . . requiring the summonses be quashed under principles asserted by petitioners related to 'relevance,' 'realistic expectation rather than an idle hope,' prohibition against 'overbroad' and 'disproportionate' 'rambling expeditions' and 'fishing expeditions,' as independent theories and also as incorporated under the 'impermissible purpose' and 'relevance' factors for the core *Powell/Clarke* test." Aplt. Br. at 75 (capitalization omitted and placement of commas corrected). We

25

conclude that this argument is merely a rehash of all of the previous arguments made

by petitioners elsewhere in their opening brief.  We therefore summarily reject it.

IV

The judgments of the district court are AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge